## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

NATIONAL FEDERATION OF THE
BLIND, on behalf of its members and
itself, and HEIDI VIENS,

                    Plaintiffs,

      v.

SCRIBD, INC.,

                  Defendant.

Docket No. 2:14-cv-00162-wks

ORAL ARGUMENT REQUESTED

## PLAINTIFFS' MEMORANDUM OF LAW OPPOSING MOTION TO DISMISS

The Americans with Disabilities Act ("ADA") is remarkable for its breadth of purpose and scope. *See Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 33 (2d Cir. 1999). The Second Circuit has explained that, under Title III of the ADA, public accommodations must provide equal access to their goods and services, however and wherever they are offered. *Id.* at 32-33. This mandate effectuates the ADA's "sweeping purpose [to] . . . forbid[ ] discrimination against disabled individuals in major areas of public life." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 160 (2d Cir. 2013).

In this era of ubiquitous technology, Internet websites and mobile applications on smartphones and tablets are major areas, if not fixtures, of public life. *E.g.*, Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, 75 Fed. Reg. 43460, 43461 (July 26, 2010) ("Today the Internet, most notably the sites of the Web, plays a critical role in the daily personal, professional, civic, and business life of Americans."). Because Congress foresaw the technology

boom and the promise of equality it could bring, it declared that the ADA "should keep pace with the rapidly changing technology of the times" and that its categories of public accommodations must be read expansively. H.R. Rep. 101-485 (II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391; H.R. Rep. 101-485 (III), 54 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 477. Likewise, the United States Department of Justice has steadfastly required businesses that provide services exclusively on the Internet to make those services accessible to individuals with disabilities. *See infra* Part I.E.

Binding case law is in full accord. The Second Circuit held in *Pallozzi* that Title III applies to a business engaging in the kind of activity that would make it a public accommodation, regardless of whether that business also has a brick-and-mortar location that patrons can visit. 198 F.3d at 32-33 (holding that the ADA, which should be read broadly, "was meant to guarantee [the plaintiffs] more than mere physical access" and therefore covered the sale of insurance even if the transaction was entirely concluded by phone and mail). Other courts had already reached similar conclusions. *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 20 (1st Cir. 1994); *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999). These, in turn, led to a recent decision holding that Title III applies to an Internet-based business that provides services very similar to Defendant Scribd, Inc. ("Scribd"). *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012).

*Pallozzi*'s reasoning applies fully to businesses that, like Scribd, operate exclusively on the Internet. Scribd offers its patrons access to digital reading material that can be viewed on Scribd's website or through its mobile applications. Compl. ¶ 15. Thus, Scribd fits squarely within several categories of public accommodations listed in Title III: a "place of exhibition or entertainment," a "sales or rental establishment," a "service establishment," and a "library,

gallery, or other place of public display or collection." 42 U.S.C. § 12127(7)(C), (E), (F), (H). Alternatively, even if Scribd were correct that Title III's application is constricted to operations from a physical "place," Scribd's web servers (the computers that store and transmit the digital information Scribd's patrons request via the Internet) would qualify as a "place."

The ADA addresses the exclusion of persons with disabilities from equal participation in the important aspects of public life, whether the exclusion is intentional or the result of "benign neglect." *See* 42 U.S.C. § 12101; *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 597 (S.D.N.Y. 2013). The ADA's remedy for that exclusion does not depend on whether a person purchases an insurance policy at an insurance office or, as in *Pallozzi*, by phone and mail. So, too, the ADA protects both the disabled consumer who purchases digital information from Scribd over the Internet and the one who buys a print book at a local store; in each instance, a member of the public is obtaining the goods and services of a public accommodation. Any contrary interpretation of the ADA would do violence to its purposely expansive reach and would impose restrictions the Second Circuit has rejected, Congress never intended, and the Department of Justice has refuted.

The NFB and Ms. Viens are advancing the ADA's purpose of ensuring that those who are blind have an equal opportunity to access the millions of digital written works that Scribd provides to the sighted public. There is no basis to dismiss their pursuit of that equality.

**FACTS**

Scribd provides reading and self-publishing services to the public through its website and mobile applications ("mobile apps") for Apple, Android, and Kindle smartphone and tablet devices. Compl. ¶ 15. Patrons pay $8.99 per month for unlimited access to Scribd's "digital library" of over 40 million documents. *Id.* ¶¶ 15-16. Scribd also provides self-publishing services

that allow users to upload documents to Scribd's library. *Id.* ¶ 16. Scribd's entire "library" is stored on Scribd's computer servers. Mot. at 10.

To make use of computers, many blind individuals must use screenreader software that converts graphical information found on websites and mobile apps into audio or braille formats, depending on the blind user's preference. Compl. ¶¶ 13-14. Although technological solutions exist to make its services accessible, Scribd programs its website and mobile apps so that its services are inaccessible to blind consumers using screen reader software. *Id.* ¶¶ 18-23.

## LEGAL STANDARD

A court assessing a motion to dismiss must accept the facts alleged in the complaint as true and then draw all reasonable inferences from those facts in favor of the plaintiffs. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The motion must be denied "unless it appears beyond a reasonable doubt that the [nonmovant] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *N. Sec. Ins. Co. v. Mitec Telecom, Inc.*, 38 F. Supp. 2d 345, 347 (D. Vt. 1999).

The Second Circuit is particularly "mindful of the care exercised . . . to avoid hastily dismissing complaints of civil rights violations." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). Motions to dismiss for failure to state a claim are "generally viewed with disfavor, and the standard for dismissal under Rule 12(b)(6) is quite narrow." *Jackson v. New York*, 381 F. Supp. 2d 80, 84 (N.D.N.Y. 2005).

## ARGUMENT

The ADA is a remedial statute that is construed liberally to "effectuate its sweeping purpose [to] . . . forbid[ ] discrimination against disabled individuals in major areas of public life." *Mary Jo C.*, 707 F.3d at 160; *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003); *see generally Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Access to information

4

and the social and economic opportunities that flow therefrom is one of the major areas of public life that the ADA sought to open for persons with disabilities. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014). Requiring Scribd's online reading services to be made accessible to all of the public fulfills the ADA's promise.

I.      **Scribd is a public accommodation subject to Title III of the ADA.**

Title III broadly prohibits discrimination by public accommodations: "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182. A list of 12 categories of entities, grouped according to the goods and services they offer, are defined as public accommodations. *Id.* § 12181(7). As with the rest of the ADA, that list "should be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77 (2001) (internal quotation marks omitted).

Scribd places its hope for dismissal on the premise that Title III requires a public place that consumers may visit.  However, a plain reading of the ADA, its legislative history, cases construing the statute, and the Department of Justice's interpretation of the law all support that it is the nature of the services Scribd provides that makes it a public accommodation under Title III of the ADA.

A.      **In *Pallozzi v. Allstate Life Insurance Co.*, the Second Circuit held that Title III covers an entity like Scribd even when it does not provide its goods and services in a brick-and-mortar location.**

The Second Circuit has authoritatively addressed the core issue in this case, holding that a "public accommodation" that provides the goods or services listed in the 12 statutory categories is covered by Title III of the ADA, even when those goods or services are not offered

at a public location. *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32-33 (1999). This decision is controlling here and confirms that Title III applies to businesses like Scribd that provide the services of a public accommodation via the Internet.

The Pallozzis sued Allstate Life Insurance Company for rejecting their application for a joint policy because of their disabilities. *Id.* at 30. As Allstate emphasized to the Second Circuit, the Pallozzis never visited an Allstate office to obtain a policy;[1] instead, they apparently engaged Allstate's underwriting services through either telephone or written correspondence. Allstate's Brief at 13 n.8; Allstate's Response Brief to Amicus Curiae Brief of United States of America at 4 n.2.[2]

Allstate had moved to dismiss, in pertinent part, on the ground that Title III defines the term "public accommodation" to mean an "insurance office" consumers visit, but not an insurance company that performs the underwriting in question in some location off-limits to customers. *Pallozzi*, 198 F.3d at 32. The Second Circuit rejected this argument and held that "the statute was meant to guarantee [the plaintiffs] more than mere physical access." *Id.* (citing *Carparts Distrib. Ctr., Inc.*, 37 F.3d at 20). *Pallozzi* thus stands for the proposition that the operation of an office open to the public is not a prerequisite for coverage under Title III. . *Id.* at 32 & n.3.

The *Pallozzi* Court further warned against attempts to read a public place requirement into the ADA when it explained Title III's mandate regarding the "full and equal enjoyment of

[1] Mr. Pallozzi was diagnosed with agoraphobia, 198 F.3d at 30, an anxiety disorder that often causes a fear of public places. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 432-33 (4th ed. text rev. 2000).

[2] The NFB and Ms. Viens attach as an Appendix all briefs they cite from the record in *Pallozzi*.

the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182. The Court said it found

> no merit in Allstate's contention that, because insurance policies are not used in places of public accommodation, they do not qualify as goods or services "of a place of public accommodation." The term "of" generally does not mean "in," and there is no indication that Congress intended to employ the term in such an unorthodox manner.

*Pallozzi*, 198 F.3d at 33.

*Pallozzi*'s reasoning applies with equal force to Scribd. Because the ADA covers the services "of" (not "in") a public accommodation, *id.*, it does not matter how or where a Scribd patron accesses Scribd's services (i.e., via website or mobile apps). Like Allstate's underwriting activities, Scribd's services are not offered at an office or store that a patron could visit. Just as *Pallozzi* found that Allstate's underwriting activities fell within the analogous "insurance office" example provided in the definition of "public accommodation," *id.* at 32-33, so, too, Scribd's online services equate to a "library, gallery, or other place of public display or collection," among other examples provided by the statute. Scribd does not deny that it considers itself to be a form of "library." Compl. ¶ 26; Mot. at 6; *see infra* Part I.B.1.

*Pallozzi* also forecloses one of Scribd's central arguments by distinguishing two of the principal cases Scribd cites: *Parker v. Metropolitan Life Insurance Co.*, 121 F.3d 1006 (6th Cir. 1997), and *Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3d Cir. 1998). 198 F.3d at 32 n.3. The Second Circuit noted that the plaintiffs in *Parker* and *Ford* obtained the policies through their employers. *Id.* Title III was thus inapplicable to complaints by employees who lacked any "nexus" to a public accommodation. *Id.* Accordingly, in a companion case to *Pallozzi*, the Second Circuit found the insurance company was not a public accommodation when the employer was an intermediary in the purchase of the subject insurance policy. *Leonard F. v.*

*Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107-08 (1999).[3] But in *Pallozzi*, and in this case, the plaintiffs seek services directly from the public accommodation. Compl. ¶¶ 15-16. Therefore, the required "nexus" exists and Title III applies.

Scribd ignores the irrational and impermissible result its argument would produce—making discriminatory conduct lawful when it is conducted online. Under Scribd's view, because a subsidiary of Allstate's called "esurance" offers insurance solely over the Internet rather than in offices, *see* https://www.esurance.com/commercials (touting the advantages of having been "born online"), it could engage in the very conduct that the Second Circuit found was forbidden to its parent Allstate. *Pallozzi*'s focus, properly, was on whether the services the entity offered brought it within the ambit of Title III, not the locus from which the services are offered, and thus would allow neither such an absurd result nor Scribd's exemption from the statute.

**B.     Statutory construction of the ADA confirms that the statute applies to a public accommodation that offers services exclusively over the Internet.**

**1.     Read broadly and plainly, Title III covers Scribd's business activities.**

Statutory construction of Title III supports *Pallozzi*'s holding and independently mandates denial of Scribd's motion. Scribd meets the ADA's "liberally" construed definition of "public accommodation" in every way. *PGA Tour, Inc.*, 532 U.S. at 676-77. First, a public accommodation must be a "private entit[y]," *id.*, which is defined broadly as "any entity other than a public entity" covered by Title II. 42 U.S.C. § 12181(6). An "entit[y]" is a place-less concept that focuses on a distinct existence for tax purposes, such as a corporation or other

---

[3] With the exception of an unpublished district court opinion that preceded *Pallozzi* and that limited the ADA to physical places, *Rome v. MTA/N.Y.C. Transit*, No. 97-CV-2945 (JG), 1997 WL 1048908 (E.D.N.Y. Nov. 18, 1997), Scribd relies on decisions from outside of the Second Circuit. Mot. at 8, 13, 15-17. The majority of the cases to which Scribd refers are make-weight citations to district-level decisions bound to follow appellate decisions in the 9th and 11th Circuits that are contrary to *Pallozzi*. *Id.* at 15-17.

business form. Black's Law Dictionary 532 (1990).[4] Scribd, Inc., satisfies that criterion. Compl. ¶ 11.

The definition next requires an entity to "affect commerce." 42 U.S.C. § 12181(7). The ADA defines "commerce" as including "trade . . . commerce . . . or communication." *Id.* § 12181(1). Thus, Congress regarded "communication," which does not require a brick-and-mortar location that can be visited by patrons, as commerce. Plaintiffs have alleged that Scribd communicates written works to patrons in the form of digital information over the Internet. *Id.*; Compl. ¶¶ 15-24. As Congress contemplated, Scribd affects commerce under Title III without offering a storefront for its patrons to visit personally.

Title III then defines a public accommodation by the type of business activity the entity conducts. 42 U.S.C. § 12181(7). Because Scribd sells reading and self-publishing services to the public, it is a "place of exhibition or entertainment," a "sales or rental establishment," a "service establishment," and a "library, gallery, or other place of public display or collection." *Id.* § 12181(7)(C), (E), (F), (H).

As Scribd satisfies each of the statutory components of a public accommodation, it must be held accountable to Title III's accessibility mandate. Scribd argues, however, that the statute's reference to a "place" of public accommodation means that only structures open to the public are covered by Title III. The rules of statutory construction completely answer this argument.

Scribd relies selectively on one dictionary definition of "place" as proof that "place" can mean only a physical space. Mot. at 8. However, the dictionary offers 49 additional meanings, some of which bear no relationship to physical locations. Webster's Encyclopedic Unabridged

---

[4] The Supreme Court and Second Circuit have looked to dictionaries contemporaneous to the passage of the statute in question to understand statutory terms. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2003 (2012); *In re WorldCom, Inc.*, 723 F.3d 346, 354 (2d Cir. 2013).

Dictionary of the English Language 1478 (1996) (including entries such as "position, situation, or circumstances"). Thus, the definition that Scribd claims to end the debate at best perpetuates it. *See Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992) ("The existence of alternative dictionary definitions of the word . . . each making some sense under the statute, itself indicates that the statute is open to interpretation.").

The more instructive source for understanding the meaning of the statutory language is its everyday usage. Indeed, the Second Circuit places more weight on a term's common usage than its dictionary definition. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2006) (favoring how a word is "more frequently used and understood in common parlance" than its array of dictionary definitions); *see also Muscarello v. United States*, 524 U.S. 125, 127-33 (1998) (examining not just dictionary definitions of the term "carry," but also its usage in popular literature and newspapers). The everyday usage of "place" confirms Ms. Viens and the NFB's broad reading of the ADA.

The Internet is routinely described as a "place," and it is often ascribed physical attributes. *E.g.*, Shani Else, Note, *Courts Must Welcome the Reality of the Modern World: Cyberspace is a Place Under the Americans with Disabilities Act*, 65 Wash. & Lee L. Rev. 1121, 1145-48 (2008). As a society, we speak of email "addresses," discussions on Internet chat "rooms," posts on Facebook "walls," and shopping at online "shops" and "stores." The Internet as a whole is referred to as "cyberspace." Newspapers and other media habitually refer to websites as "places." [5] The following samples stand for thousands of others like them:

---

[5] Because the relevant information in these media reports is the word usage, and not the truth of the matters asserted in them, the Court has discretion to take judicial notice of the reports. *Steiner v. Shawmut Nat'l Corp.*, 766 F. Supp. 1236, 1241 n.13 (D. Conn. 1991); 5A C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1364, at 475–81 (1990).

- "The only other <u>place</u> I can look is on the insurer's website,"[6]

- "Something else I've grown to love about the website is much less common: It's a wonderful <u>place</u> to shop,"[7]

- "The club's Web site includes a <u>place</u> to donate to a fire-relief fund and a wish list of items ranging from audio and visual equipment to old skis,"[8] and

- "The Internet is not just a single <u>place</u>, it is lots of <u>places</u>."[9]

Scribd and other businesses that create websites and mobile apps also refer to the Internet as a "place." The co-founder and CEO of Scribd, John R. "Trip" Adler, has consistently described his company's online presence as a "place" and has likened using Scribd to "being in a real-world book store or library."[10] Again, the following are just representative examples:

- "Scribd is the <u>place</u> where connections form around shared reading interests,"[11]

- "We want to be the <u>place</u> where people can publish instantly to their audiences . . . ,"[12] and

- "Scribd's goal is to collect all the world's written information -- whether for free or for purchase -- in one <u>place</u> . . . ."[13]

---

[6] Paul Downs, *Help Needed on Health Plans*, N.Y. Times, Jan. 9, 2014, at B5 (emphasis added).

[7] Jenna Wortham, *A Bazaar Where You Least Expect It*, N.Y. Times, March 9, 2014, at BU4 (emphasis added).

[8] *Green Mountain Club fire*, Burlington Free Press, March 14, 2004 (emphasis added).

[9] George Malek, *Beaulieu Place is well received*, Times Argus, Nov. 1, 2001 (emphasis added).

[10] Bloomberg TV, Interview of Trip Adler, 2014 WLNR 14693885 (May 30, 2014), *also available at*: http://www.bloomberg.com/video/scribd-subscription-app-for-digital-book-worms-CAPuh4~CSCeY3DjEZT2DTg.html ("[W]e're sort of like the - the digital version of a book store, right? You go to our site to browse around and discover new books the same way you would do in - at a book store in the physical world.")

[11] *Scribd Launches Readcast*, Associated Press Alert, Apr. 21, 2010 (emphasis added).

[12] Bobbie Johnson, *How Scribd made pages pay*, The Guardian, July 22, 2009, at Tech (emphasis added).

[13] *Harvard University Press to Sell Nearly 1,000 Digital Books on Scribd*, Associated Press Alert, July 16, 2009.

Other website businesses, such as the website development company Go Daddy, have adopted the same understanding of the Internet as a place: "We've long taken it as a priority at Go Daddy to make the Internet a better and safer <u>place</u>."[14]

In light of the digital community's use of "place," including Scribd's self-description, there is no "linguistic reason to think that Congress intended to limit the word" to exclude Scribd's website and mobile apps from the ADA's categories of public accommodations. *Muscarello*, 524 U.S. at 131.

Scribd attempts to narrow the ADA by selectively applying the principles of *noscitur a sociis* and *ejusdem generis*. Mot. at 9-10. The Supreme Court has cautioned against just such a cramped reading: "we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting the application of the principle of *noscitur a sociis*).

Instead, the dispositive factor in construing the statute is Congress's intent. *United States v. Alpers*, 338 U.S. 680, 682 (1950) (instructing that the rule of *ejusdem generis* cannot be employed to "obscure and defeat the intent and purpose of Congress"); *United States v. Kennedy*, 233 F.3d 157, 161 n.4 (2d Cir. 2000) (same); *see also United States v. Pacione*, 738 F.2d 567, 570 (2d Cir. 1984) (stating that a court should consult legislative history to resolve any conflict between principles of statutory interpretation). The legislative history of the ADA confirms the NFB and Ms. Viens' broad reading of the statute.

---

[14] *E.g.*, *Targeting Websites Dedicated to Stealing American Intellectual Property Before the U.S. Senate Committee on the Judiciary*, 112th Cong. 1 (2011) (statement of Christine N. Jones, Executive Vice President, General Counsel, and Corporate Secretary, The Go Daddy Group, Inc.)) (emphasis added).

> **2.      Congress declared that the ADA should be interpreted to "keep pace with the rapidly changing technology of the times," such as websites and mobile apps.**

The legislative history of the definition of "public accommodation" shows that Congress wanted the list of 12 exemplars in the definition to be "construed liberally" in harmony with the ADA's broad purpose. S. Rep. No. 101-116, 59 (1990) ("[W]ithin each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities. The Committee intends that the 'other similar' terminology should be construed liberally consistent with the intent of the legislation . . . ."); *see also* H.R. Rep. 101-485 (III) at 54, *reprinted in* 1990 U.S.C.C.A.N. at 477 (same). The law's breadth is evident in Congress's agreement with the Attorney General's view that the definition "must bring Americans with disabilities into the mainstream of society 'in other words, full participation in and access to all aspects of society.'" H.R. Rep. 101-485 (II) at 36, *reprinted in* 1990 U.S.C.C.A.N. at 317 (internal citation omitted).

Congress unequivocally intended that the ADA's broad mandate for providing access to public accommodations apply to emerging technologies like those now offered by Scribd. "[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill,[15] should keep pace with the rapidly changing technology of the times." *Id.* at 108, *reprinted in* 1990 U.S.C.C.A.N. at 391 (cited in *Netflix*, 869 F. Supp. 2d at 200-01). Unquestionably, new technologies would be subject to the ADA:

---

[15] One court has concluded that the services and communications provided on a public transit agency's website must be made accessible under Title II of the ADA. *Martin v. Metro. Atl. Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1377 (N.D. Ga. 2002) (construing 42 U.S.C. § 12132).

"technological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities." *Id.*[16]

Congress specifically identified "[i]nformation exchange" – Scribd's principal service – as an area where expanding technology would be subject to the ADA. *Id.*; *see also* H.R. Conf. Rep. No. 101-596 at 67-68 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565, 576-77 (recognizing that "[i]n the future, new technology, such as speech-to-text services, may require other forms of direct access" to 911 emergency services for the deaf). Scribd warrants no exemption from Congress's expectation that the ADA would adapt to include new technology. The ADA is designed to protect people with disabilities whether they encounter discrimination in services offered by a public accommodation in person, through the mail, over the phone, via the Internet, or whatever medium comes next in the evolution of technology.

Because Congress purposely created broad protections intended to ensure access to services made available through new technologies, there has never been a need to amend the ADA to include websites as Scribd argues was necessary. Mot. at 11. Further, the Supreme Court has said that congressional inaction cannot establish an affirmative legal rule. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) ("[I]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of one of this Court's decisions.") (internal quotation marks omitted); *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective

---

[16] Over a decade before the enactment of the ADA, the Supreme Court noted in applying the Rehabilitation Act of 1973 that "[i]t is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities . . . ." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412 (1979).

legislation a controlling legal principle"). The services Scribd provides are readily classified in the categories of services listed in the ADA's definition of "public accommodation." The current statute provides all the authority necessary to hold Scribd accountable.

      **C.** *Pallozzi* **was premised on judicial decisions that apply the ADA to public accommodations regardless of whether their services are provided from a public place.**

      The breadth of the decisions on which *Pallozzi* relied supports denial of Scribd's motion. One such decision is *Carparts*, which holds that "[t]o . . . limit the application of Title III to physical structures . . . would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public." *Pallozzi*, 198 F.3d at 32 (quoting *Carparts*, 37 F.3d at 20).

      The defendant in *Carparts* had no public office for the plaintiff to visit; rather, the defendant company sponsored plaintiff's self-funded medical reimbursement plan that provided services via correspondence. *See* 37 F.3d at 14. When the plaintiff sued the plan sponsor under Title III for discriminating against individuals with HIV in providing reimbursement benefits, the district court dismissed the claim on the ground that the ADA applied to physical places only. *Id.* at 14-15, 18. The First Circuit reversed and held that the plan sponsor was subject to the ADA because "[t]he plain meaning of the terms [of Title III] do[es] not require 'public accommodations' to have physical structures for persons to enter." *Id.* at 19.

      *Carparts* examined the 12 categories of public accommodations and reasoned that the inclusion of "travel service," which could be accessed via phone or mail, meant that "Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure." *Id.* Presciently, the Court added that "one can easily imagine the existence of other service establishments conducting business by

mail and phone without providing facilities for their customers to enter in order to utilize their services." *Id.* The Court then concluded that Congress did not intend to offer protection to those who enter an office to purchase services, but deny protection to those who purchase the same services over the phone or by mail. *Id.* The NFB and Ms. Viens are members of this latter group of consumers whom Congress intended to protect in their transactions with public accommodations that choose not to offer a physical space in which to provide their services.[17]

Another decision cited in *Pallozzi* specifically lists websites as a type of public accommodation. 198 F.3d at 33 (citing *Doe*, 179 F.3d at 559). Chief Judge Posner, writing for the Seventh Circuit, explained that:

> the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, <u>Web site</u>, or other facility (whether in physical space or in electronic space, [citing *Carparts*]) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the non-disabled do.

*Id.* at 559 (emphasis added).

**D.   The decision in *National Ass'n of the Deaf v. Netflix, Inc.,* confirms the application of the ADA to the Internet.**

In *Netflix,* a district court in Massachusetts recently applied the reasoning common to *Carparts, Pallozzi* and *Doe* to find that Title III applies to public accommodations that exist and provide services solely over the Internet. In that case, the plaintiffs sued Netflix, an Internet-based movie rental company, for failing to close-caption certain videos it provides for online viewing. 869 F. Supp. 2d at 198. Netflix argued that because its video services were accessed exclusively online and not in a public store, it was not covered by Title III. *Id*. at 199-200. The district court looked to *Carparts* for guidance. The court found that *Carparts* supported the

---

[17] *See, e.g.*, *Netflix*, 869 F. Supp. 2d at 201 (stating that the ADA was intended to cover "businesses that provide services to a customer's home—such as plumbers, pizza delivery services, or moving companies").

plaintiffs' argument that the Netflix website "was analogous to a brick-and-mortar store or other venue that provides similar services, such as a video rental store," and was thus a public accommodation under Title III. *Id.* at 200. The *Netflix* Court opined that the purpose of the ADA and the realities of technology-driven modern life required that Internet-only businesses be subject to the statute:

> [i]n a society in which business is increasingly conducted online, excluding businesses that sell services through the Internet from the ADA would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public."

*Id.* (quoting *Carparts*, 37 F.3d at 20).

Like the online videos Netflix provided, Scribd's website and mobile apps provide rental services that consumers access exclusively over the Internet. And just as Netflix's website was analogous to a video rental store covered by the ADA, Scribd's website and mobile apps that provide access to over 40 million written works are analogous to a library, Compl. ¶ 15, which is specifically listed among the ADA's exemplar public accommodations. 42 U.S.C. § 12181(7)(H). Because *Netflix* and this case are indistinguishable, this Court should reach the same result and find that Scribd is a public accommodation under the ADA.

### E. The U.S. Department of Justice has consistently stated that public accommodations offering goods and services without a brick-and-mortar location, including websites, are covered by Title III.

Since the early days of the ADA, the U.S. Department of Justice ("DOJ") has consistently told courts, members of Congress, and businesses that Title III applies to web-based businesses like Scribd. That position, which, as discussed below, this Court should accord deference, compels the denial of Scribd's Motion.

In 1996, Senator Tom Harkin, the chief Senatorial sponsor of the ADA, asked the DOJ whether the ADA applies to websites. The DOJ confirmed that it does:

> Covered entities under the ADA are required to provide effective communication, regardless of whether they generally communicate through print media, audio media, or computerized media such as the Internet. Covered entities that use the Internet for communications regarding their programs, goods, or services must be prepared to offer those communications through accessible means as well.

Letter from Deval L. Patrick, Assistant Attorney General, to Senator Tom Harkin (Sept. 9, 1996), *available at* http://www.justice.gov/crt/foia/readingroom/frequent_requests/ada_tal/tal712.txt. That has been DOJ'a position for well over a decade. In 2010, Samuel R. Bagenstos, the Principal Deputy Assistant Attorney General for Civil Rights, testified before a House subcommittee that "a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability." *Emerging Technologies and the Rights of Individuals with Disabilities: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong. 5, 6 (emphasis added).

The DOJ has initiated litigation and filed briefs to enforce its interpretation that Title III covers websites that offer the services of a public accommodation, including in *Netflix,* where it said "a web-based service . . . should be considered a public accommodation just like a travel service that has no physical structure for customers to enter, but conducts business by telephone." [18] Indeed, the DOJ took the position in *Pallozzi* that "an insurance company representative may solicit business and sell insurance coverage to individuals over the telephone,

---

[18] Statement of Interest of the United States of America in Opp'n to Def.'s Mot. for Judgment on the Pleadings at 7, *Netflix*; *see also e.g.*, Brief of the United States of America as Amicus Curiae in Support of Appellant at 7, *Hooks v. OKbridge, Inc.*, No. 99-50891, 1999 WL 33806215 (5th Cir. Aug. 1, 2000) (arguing that a company operating bridge tournaments exclusively on the Internet is covered by Title III); *see also* Brief of the United States of America as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Prods., Ltd.*, No. 01-11197, 1999 WL 33806215 (11th Cir. May 3, 2001) (arguing against the notion that Title III applies only when there is a nexus between an accommodation's challenged activity and its brick-and-mortar facility); Mot. of United States of America to Intervene as Pls., *Nat'l Fed'n of the Blind v. HRB Digital LLC*, Civil Action No. 1:13-cv-10799-GAO (intervening to challenge the legality of H&R Block's inaccessible website and mobile apps).

through the mail, or via the Internet without inviting customers to physically enter the company's office" and still be covered under Title III for "literally operating an 'insurance office." Amicus Curiae Brief of the United States of America at 14, *Pallozzi*. The DOJ's enforcement of the ADA also includes settlements with Internet-only businesses, such as the Peapod online grocery delivery service, and other entities providing goods and services online.[19]

DOJ is also in the process of promulgating regulations that will clarify that public accommodations that operate exclusively online are covered by the ADA. *See* 75 Fed. Reg. at 43465 ("title III reaches the Web sites of entities that provide goods or services that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations.").

Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994), the Court should accord at least "considerable" deference to the Department's consistent interpretation that Title III applies to websites and mobile apps. Scribd's contrary argument ignores that an agency's interpretation

---

[19] *E.g.*, Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/11/17/peapod_settlement_agreement.pdf (requiring online grocery delivery service to provide an accessible website and mobile apps); Project Civic Access Agreement Between the United States of America and Warrenton, Virginia Under the Americans with Disabilities Act, *available at* http://www.ada.gov/warrenton_va_pca/warrenton_va_pca.htm (requiring, among other things, that the town of Warrenton, VA provide an accessible website); Settlement Agreement Between the United States of America and The Newseum, Inc. (Dec. 6, 2013), *available at* http://www.ada.gov/newseum/newseum-sa.htm (requiring the Newseum to ensure that its website complied with the Web Content Accessibility Guidelines); Settlement Agreement Between the United States of America, Fremantle Productions, Inc., & CBS Broadcasting Inc. (Sept. 20, 2011), *available at* http://www.ada.gov/price-is-right.htm (requiring the producer of The Price Is Right to develop an accessible website); Consent Decree, *United States of America v. QuikTrip Corp.*, (D. Neb. July 15, 2010), *available at* http://www.ada.gov/quiktrip_ consent.htm (requiring convenience store operator to ensure accessibility of its website); *see also* Settlement Agreement Between the United States of America and Atlanta's John Marshall Law School (Apr. 26, 2011), *available at* http://www.ada.gov/john-marshall-lawsch.htm (requiring that law school cease using inaccessible online application process).

of statutory (rather than regulatory) language is also owed deference. *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (holding that an agency's interpretation of a statute may merit some deference given the "specialized experience and broader investigations and information" available to the agency (quoting *Skidmore*, 323 U.S. at 139)). Indeed, subsequent to *Christensen v. Harris County*, on which Scribd relies, the Supreme Court has "pointed to instances in which the Court has applied [binding] *Chevron* deference to agency interpretations that did not emerge out of notice-and-comment rulemaking." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

The question of whether and how much deference is owed "depends in significant part upon the interpretive method used and the nature of the question at issue." *Id.* The DOJ's expertise regarding public accommodations, the consistency of its interpretation over nearly 20 years, the careful consideration used to reach its conclusion, and the persuasiveness of its interpretation warrant *Skidmore* deference. 323 U.S. at 140. Because the DOJ's interpretation of its Title III regulations is true to Congress's intent, it should be followed here and this Court should deny Scribd's motion.

## II.   Because Scribd servers are physical places that patrons access to obtain services, Scribd must comply with Title III.

Even if the Court were to conclude that for Title III to apply, Scribd's operation of a website and mobile apps required a physical "place," the company's hardware that provides the services accessed by the website and mobile apps would satisfy such a requirement.

Scribd's patrons access the company's extensive library of electronic documents by navigating to the Scribd website or launching the Scribd mobile app on their smartphone or tablet. Compl. ¶ 16; Mot. at 6. Consumers ultimately must access Scribd's web servers to obtain access to the information they seek. Mot. at 5-6. Because these servers are physical places under Title III, Scribd is subject to the ADA.

The regulations implementing Title III define "[p]lace of public accommodation" as "a facility operated by a private entity whose operations affect commerce and fall within at least one of the [12] categories" listed in the ADA. 28 C.F.R. § 36.104. Scribd argues that "facility" is the operative term in this definition, Mot. at 2, 10, but it ignores that the regulations define "facility" as "all or any portion of buildings, structures, sites, complexes, <u>equipment</u>, rolling stock or other conveyances, roads, walks, passageways, parking lots, <u>or other real or personal property</u>, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 36.104 (emphasis added). Congress expressed its intent that "facility" was to be broadly construed to cover all manner of human-constructed objects: "[t]his definition . . . includes both indoor areas and outdoor areas where human-constructed improvements, structures, equipment, or property have been added to the natural environment." H.R. Rep. 101-485 (II), 114 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 397.

Scribd's web servers are human-built. Mot. at 5-6. Because they exist for the purpose of transmitting requested data, they meet the plain understanding of "equipment." Black's Law Dictionary 537 (1990) (defining "equipment" as "[f]urnishings, or outfit for the required purposes"); Webster's Encyclopedic Unabridged Dictionary of the English Language 656 (1996) ("anything kept, furnished, or provided for a specific purpose"). Further, the Second Circuit has discussed "computer equipment, bandwidth, and server capacity" as examples of "traditional personal property."[20] *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 36 n.19 (2d Cir. 2002).

---

[20] Relatedly, some cases have found that electronic data stored on servers and other computer equipment is physical in nature because it "takes up space on the tape, disc, or hard drive, makes physical things happen, and can be perceived by the senses." *E.g.*, *Landmark Am. Ins. Co. v. Gulf Coast Analytical Labs., Inc.*, No. CIV.A. 10-809, 2012 WL 1094761, at *3-4 (M.D. La. Mar. 30, 2012); *S. Cent. Bell Tel. Co. v. Barthelemy*, 643 So. 2d 1240, 1246 (La. 1994).

Thus, Scribd's computer servers are "equipment," and "personal property," qualifying those servers as a "facility" under the ADA.

As a facility, Scribd's servers, which provide patrons access to millions of written works in the form of electronic documents, fit squarely within several of the categories of "places of public accommodation": a "place of exhibition or entertainment," a "sales or rental establishment," a "service establishment," and a "library, gallery, or other place of public display or collection." 28 C.F.R. § 36.104. It makes no difference that Scribd patrons do not personally visit the building that contains Scribd's web servers; their access to the data in the servers is covered. Public accommodations must allow persons with disabilities equal access to their products and services, wherever and however they are provided. *Pallozzi*, 198 F.3d at 33; *Carparts*, 37 F.3d at 20; *see also* DOJ, Technical Assistance Manual § III-1.2000 (explaining that while the portion of a facility that is not open to the public is not bound by Title III, "any policies or decisions made in the administrative offices that affect [the public] would be subject to the requirements for public accommodations"). Thus, Scribd's decision to deny blind patrons equal access to its services, which are provided by its web servers, is well within the scope of Title III.

## CONCLUSION

Title III of the ADA applies to public accommodations like Scribd that do not use brick-and-mortar stores to offer their goods and services to the public. Scribd's arguments to the contrary defy the clear holding of *Pallozzi*, the mandated plain and broad reading of the text and purpose of Title III, and the steadfast position of the Department of Justice. Additionally, the ADA applies to Scribd because the public accesses Scribd's services through a physical place—Scribd's server facilities. Servers, websites, and mobile apps exemplify the types of technological developments Congress specifically intended the ADA to encompass.

Given the ubiquity of online businesses in today's society, confining the ADA to physical stores would leave disabled Americans more marginalized than they were in 1990. Nothing in the ADA entitles Scribd, with over 80 million patrons, to an exemption from the mandate that public accommodations must provide equal access to their services.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Scribd's Motion to Dismiss.

Respectfully submitted,

  /s/ Laurence Paradis                              /s/ Daniel F. Goldstein
DISABILITY RIGHTS ADVOCATES            BROWN, GOLDSTEIN & LEVY, LLP
LAURENCE PARADIS (*pro hac vice*)        DANIEL F. GOLDSTEIN (*pro hac vice*)
lparadis@dralegal.org                             dfg@browngold.com
HABEN GIRMA (*pro hac vice*)               GREGORY P. CARE (*pro hac vice*)
hgirma@dralegal.org                              gpc@browngold.com
2001 Center Street, Fourth Floor              120 E. Baltimore Street. Suite 1700
Berkeley, CA  94704-1204                        Baltimore, MD 21202
Telephone:      (510) 665-8644                  Telephone:      (410) 962-1030 x1314
Facsimile:       (510) 665-8511                  Facsimile:       (410) 385-0869
TTY:             (510) 665-8716

                                                        /s/ Emily J. Joselson
REBECCA RODGERS (*pro hac vice*)        LANGROCK SPERRY & WOOL, LLP
rrodgers@dralegal.org                           EMILY J. JOSELSON (VT BAR NO. 683)
40 Worth Street, 10th Floor                     ejoselson@langrock.com
New York, NY 10013                              JAMES T. DEWEESE
Telephone:      (212) 644-8644                  jdeweese@langrock.com
Facsimile:       (212) 644-8636                  111 S. Pleasant Street
TTY:             (510) 665-8716                  PO Drawer 351
                                                        Middlebury, VT 05753-0351
                                                        Telephone:      (802) 388-6356
                                                        Fax:             (802) 388-6149

                                                        *Attorneys for Plaintiffs*

## REQUEST FOR ORAL ARGUMENT

Plaintiffs hereby respectfully request that the Court hold oral argument on the Motion to Dismiss, this Opposition Memorandum, and any replies thereto.

                                                        /s/ Emily J. Joselson
                                                        EMILY J. JOSELSON

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

NATIONAL FEDERATION OF THE
BLIND, on behalf of its members and
itself, and HEIDI VIENS,
                              Plaintiffs,

        v.

SCRIBD, INC.,
                      Defendant.

Docket No. 2:14-cv-00162-wks

## CERTIFICATE OF SERVICE

This is to certify that on the 29th day of December, 2014, I, Daniel F. Goldstein, attorney for the Plaintiffs, electronically filed with the Clerk of the Court *PLAINTIFFS' MEMORANDUM OF LAW OPPOSING MOTION TO DISMISS* by using the CM/ECF system.  The CM/ECF system will provide service of such filing via Notice of Electronic Filing (NEF) to the following NEF parties:

Gary F. Karnedy, Esq.
gkarnedy@primmer.com,
ageritano@wsgr.com,
cmeilleur@primmer.com

Emily J. Joselson, Esq.
James T. DeWeese, Esq.
ejoselson@langrock.com,
jdeweese@langrock.com,
mnewton@langrock.com,
lbrunet@langrock.com

Laurence Paradis, Esq.
Rebecca J. Rodgers, Esq.
Haben Girma, Esq.
Lparadis@dralegal.org,
rrodgers@dralegal.org,
Hgirma@dralegal.org

I also caused the above-referenced document to be served, by e-mailing a copy of the same on the following non-NEF parties:

David H. Kramer Esq
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA  94304
DKramer@wsgr.com

Tonia M. Ouellette Klausner , Esq.
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
tklausner@wsgr.com

DATED at Baltimore, Maryland this 29th day of December, 2014.

BROWN, GOLDSTEIN & LEVY, LLP


/s/ Daniel F. Goldstein
Daniel F. Goldstein, Esq. (*pro hac vice*)
Gregory P. Care, Esq. (*pro hac vice*)
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
dfg@browngold.com
gpc@browngold.com
Phone: (410) 962-1030
Fax: (410) 385-0869

*Attorneys for Plaintiffs*