UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

NATIONAL FEDERATION OF THE          *
BLIND, on behalf of its members*
and itself, and HEIDI VIENS,   *
          V.                    *     Case No:  2:14-cv-00162-wks
SCRIBD, INC.                    *

MOTION TO DISMISS
MARCH 3, 2015
BURLINGTON, VERMONT

BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:
     Daniel F. Goldstein, Esq., Gregory P. Care, Esq., Brown
Goldstein Levy, 120 E. Baltimore Street, Suite 1700, Baltimore,
MD 21202; Attorneys for the Plaintiffs.
     Emily J. Joselson, Esq., Langrock Sperry & Wool, 111 S.
Pleasant St., P.O. Drawer 351, Middlebury, VT  05753-0351
College Street; Attorney for the Plaintiffs.
     James T. DeWeese, Esq., Langrock Sperry & Wool, 210
College Street, 4th Fl., P.O. Box 721, Burlington, VT; Attorney
for the Plaintiffs.
     Haben Girma, Esq., Disability Rights Advocates, 2001
Center Street, 4th Fl., Berkeley, CA  94704-1204; Attorney for
the Plaintiffs.
     Meghan Sidhu, Esq., National Federation of the Blind, 200
East Wells Street, Baltimore, MD  21230; Attorney for the
Plaintiffs.
     Tonia Ouellette Kalusner, Esq., Wilson Sonsini Goodrich &
Rosati, 1301 Avenue of the Americas, 40th Fl., New York, NY
10019-6022; Attorney for the Defendant.
     Gary F. Karnedy, Esq., Primmer, 150 S. Champlain Street,
P.O. Box 1489, Burlington, VT  05402-1489; Attorney for the
Defendant.

Deaf/Blind Transcriptionists:  Cameron Lash, Karen-Kim Vincent
Court Reporter:  JoAnn Q. Carson, RMR, CRR

CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

1  (The following was held in open court at 1:30 p.m.)

2          THE COURT:  Good afternoon.

3          COURTROOM DEPUTY:  This is Case Number 14-162, the

4  National Federation of the Blind and Heidi Viens versus Scribd,

5  Inc.  Present in the courtroom on behalf of the Plaintiffs are

6  Attorneys Daniel Goldstein, Gregory Care, Emily Joselson, James

7  DeWeese, Haben Girma, and Meghan Sidhu.  Also present in the

8  courtroom on behalf of the Defendants are Attorneys Gary

9  Karnedy and Tonia Ouellette Klausner.  The matter before the

10  Court is a hearing on a motion to dismiss.

11          THE COURT:  All right.  We've reversed the courtroom

12  just to accommodate counsel and the motion to dismiss filed by

13  Scribd.  Who is going to argue on behalf of the Defendant?

14          MS. OUELLETTE KLAUSNER:  I will.  Your Honor.

15          THE COURT:  Okay.  Welcome to Vermont.

16          MS. OUELLETTE KLAUSNER:  Thank you, and let me say

17  it's a pleasure to be here.  I actually attended the University

18  of Vermont and have not had an excuse to come back in over 20

19  years.  So I very much appreciate the invitation to come up

20  here and be with you all today.

21          THE COURT:  There we are.

22          MS. OUELLETTE KLAUSNER:  Here we are.

23          THE COURT:  Right.

24          MS. OUELLETTE KLAUSNER:  So everyone in the courtroom

25  is familiar with the old adage that you can't fit a square peg

1    in a round hole and that's what this case is about.  I

2    represent Scribd Inc.  Scribd is an online service.  It's a

3    digital publishing platform, and that service is not among or

4    anything like the exclusive places of public accommodation

5    listed by Congress in Title 3 of the Americans with

6    Disabilities Act.  Scribd operates software.  Specifically they

7    operate a web site and they offer software applications that

8    people can download onto a smart phone or other mobile device.

9         THE COURT:  Well essentially they are offering

10   services, whether they are library services or generally

11   speaking they are services to their potential customers.

12        MS. OUELLETTE KLAUSNER:  Correct.  They offer

13   services.  Yes.  The Plaintiffs in their complaint refer to it

14   as a reading subscription service and also an online

15   publication service I believe.  What Scribd --

16        THE COURT:  I assume they must have some structure or

17   building which is the center of their operations, is that fair

18   to say?

19        MS. OUELLETTE KLAUSNER:  They have an office.  They

20   have an office based in San Francisco.  I have not actually

21   been there, but my guess given the size of the company, they

22   are very small, it's about 80 employees or 70 something

23   employees, they probably rent office space in a shared building

24   in San Francisco, but that office is a private office.  That's

25   not where the public can obtain their services.  Services are

1   obtained over the internet exclusively or through these mobile

2   software applications that are downloaded to a phone.

3       So Scribd doesn't -- it doesn't operate any of the places

4   identified by Congress in the statute, and we've quoted the

5   pertinent language in our opening brief on pages 4 and 5.

6   Scribd doesn't operate in a hotel, motel, or other place of

7   lodging.  Doesn't operate a restaurant, a bar.  Other

8   establishments serving food or drink.  Doesn't operate a motion

9   picture house, a theater, a concert hall, a stadium or other

10  place of exhibition or entertainment, and I can go through all

11  12 categories.

12          THE COURT:  Sure.  I have read your pleadings.  Your

13  argument is that the ADA requires that there be a physical

14  place which is the source of the discrimination.

15          MS. OUELLETTE KLAUSNER:  Well the discrimination can

16  be in the product or service that is being offered, and that

17  could be a product or service that is offered at the physical

18  place of public accommodation or it could be offered in a

19  different means like over the phone or over the internet, but

20  the first question in a Title 3 claim is whether the service

21  itself is a covered entity.  Is it the owner, lessor, lessee,

22  or operator of a place of public accommodation, and numerous

23  courts have held that a place of public accommodation, so the

24  entities that are covered by the statute, are limited to

25  entities that operate actual physical places where the public

1    can enter and obtain those services.

2       That's based on a plain language reading of the statute

3    and it's also based on the Department of Justice's regulatory

4    definition of place of public accommodation.  The Department of

5    Justice when it first issued its regulations defined place of

6    public accommodation as a facility.  That's a physical

7    structure.  It went on to define facility as any or all of the

8    portions of the buildings, structures, sites, complexes,

9    equipment, et cetera.  Clearly indicating a physical place.

10            THE COURT:  Okay.  So you dispute the Plaintiff's

11   assessment or interpretation of DOJ's position that the

12   internet is covered by the ADA which is essentially, they have

13   suggested, been the case since 1996 when -- I can't remember

14   who it was who testified before Senator Harkin, but DOJ

15   representatives have consistently over the years suggested

16   apparently, according to the Plaintiff, that the internet is

17   covered by the ADA.

18            MS. OUELLETTE KLAUSNER:  We do dispute that.  The

19   Department of Justice's position today that it has taken in

20   amicus briefs and other -- outside of its regulations

21   themselves is that the internet web sites are covered that --

22   but that's not a consistent position.  It's directly contrary

23   to its official regulatory --

24            THE COURT:  Is it true that DOJ is actually

25   considering regulations to make that very clear that the

1  internet is in fact covered by the ADA currently?  Aren't they

2  in the process of developing regulations which basically codify

3  the position that they have taken over the past at least

4  decade?

5         MS. OUELLETTE KLAUSNER:  Well they definitely are

6  contemplating regulations that would talk about what is

7  required to make a web site accessible.  Now there are web

8  sites that are now even under the law in the Third Circuit,

9  Sixth Circuit, Ninth Circuit, Eleventh Circuit, all of the

10 places that have said you have to have a physical place that's

11 operating the public accommodation.  There are instances where

12 a web site would be covered because if it's a web site of one

13 of those places, it would be covered by the ADA even under

14 those state's -- interpretation of the statute.

15    So what the Department of Justice's regulations, as I

16 understand them, they have issued an advanced notice of

17 proposed rulemaking saying we are contemplating what

18 regulations might look like with respect to how to make a web

19 site of a covered entity accessible, and they are seeking

20 comment on that, including comments on whether entities like

21 Scribd that are teeny tiny companies, start-up companies that

22 don't make any money should be covered.

23         THE COURT:  You're in Vermont.  An 80-person business

24 is one of our leading industries.

25         MS. OUELLETTE KLAUSNER:  Okay.  Well in any event --

1          THE COURT:  I appreciate the fact that you may think

2     it's small, but here it's not.

3          MS. OUELLETTE KLAUSNER:  In any event, the Department

4     of Justice one of the things they are considering is whether

5     businesses of a certain size or a certain revenue should be

6     exempted from the statute.  So yes they are considering things,

7     but those things are just being considered.  They haven't been

8     enacted, and I would like to go back and make a point about the

9     question asked earlier about whether, you know, the statute was

10    passed in 1990.  Has the Department of Justice since 1996, six

11    years later, taken this position?  No.  The letter that

12    Plaintiffs cite to from 1996 talks about whether a covered

13    entity, so a place of public accommodation, must offer

14    communication services over -- if they offer them over the

15    internet whether they need to be accessible.  They did not

16    address the very different question of whether a purely virtual

17    business with no nexus to any physical place that people can go

18    to, to get the services is itself covered, and the Department

19    of Justice itself has said that and we've cited that in our

20    reply brief where the Department of Justice referred to the

21    letter that the Plaintiffs put forward here and said in that

22    letter that issue -- the letter does not address whether an

23    entity doing business exclusively on the internet is an entity

24    covered by the ADA.

25          THE COURT:  Well so the word nexus is confusing to me

1    in this particular context.  So what you're suggesting is as

2    long as there's a sufficient nexus to a physical property then

3    of course ADA would apply.

4        So how do you take -- if that's the case how do you take a

5    case like Pallozzi, which is the Second Circuit case law, which

6    suggests that the physical property is not particularly

7    important the service is important, and in fact they ruled that

8    that sale of insurance which was not -- which was not in

9    response to a physical entry into a building but done over the

10   telephone or by wire, et cetera, is covered?

11            MS. OUELLETTE KLAUSNER:  So --

12            THE COURT:  Essentially what the Second Circuit has

13   said is that is sufficient nexus to have ADA apply.

14            MS. OUELLETTE KLAUSNER:  So in the Pallozzi case the

15   Second Circuit did not address the issue that's before the

16   Court here.  So the Second Circuit was addressing whether

17   insurance purchased from an insurance office but not physically

18   at the insurance office could be subject to a Title 3 claim.

19       The Court first said -- well first they asked a question

20   whether insurance at all was regulated under Title 3, and the

21   Second Circuit said yes it can be.  The fact that Congress

22   included insurance office among the places of public

23   accommodation subject to the Act means that yes, you know,

24   subject to the safe harbor provisions elsewhere in the statute

25   insurance can be regulated under the statute.  It is regulated

1  under the statute.

2      The second question, though, was not whether Allstate was

3  a place of public accommodation.  Nobody disputed that Allstate

4  was an operator of insurance offices, which is a specific

5  entity listed in the statute as a place of public

6  accommodation.  The question was once you have a covered entity

7  is does the statute come into play if the services of that

8  entity are purchased over the phone as opposed to purchased in

9  the office itself.  Allstate argued that the Title 3 only comes

10  into play with respect to goods and services that are used

11  within the place of public accommodation itself, and the Second

12  Circuit correctly read the statute as saying no.  The statute

13  talks about the goods or services of a place of public

14  accommodation, not goods or services used in a place of public

15  accommodation.

16      THE COURT:  So what you're suggesting is the Second

17  Circuit was just saying that if in fact the insurance policy

18  was drafted in a particular building but then was contacted by

19  the -- was obtained by the customer by way of the telephone or

20  some other avenue that that's sufficient?

21      MS. OUELLETTE KLAUSNER:  Right.  It's not just that

22  it's a building.  It's a facility that falls within one of the

23  categories of public accommodations identified by Congress.  So

24  it's not any facility.  It is a facility, a concrete place

25  where the public can go to and where there are the goods

1    identified within the places of public accommodation in the

2    statute.

3        Once you have that first step so we know we're talking

4    about a place of public accommodation, then the question that

5    the Second Circuit was addressing in Pallozzi is well do you

6    actually have to physically walk in the building and purchase

7    the goods and services in the building or does the statute

8    apply even though the services are purchased from without or

9    access from without, and that's consistent with all the other

10   cases that we cited in our brief.

11       THE COURT:  What do you think about Judge Posner's

12   assessment of public accommodation focusing in particular upon

13   the word of and then listing the public accommodations in one

14   of his two opinions in which he says the web or the internet is

15   in fact public accommodations.

16       MS. OUELLETTE KLAUSNER:  Judge Posner did say that in

17   the Doe versus Mutual of Omaha opinion, however, that was not

18   the issue before the Court.  I believe it's the second

19   paragraph of the case where he's reciting background and wasn't

20   getting at the actual issue in the case.  The issue in that

21   case was whether the Title 3 regulates the content offered by a

22   place of public accommodation.

23       THE COURT:  But the fact is Judge Posner actually

24   found that the internet, which is essentially the same issue

25   here, the internet was in fact public accommodation.  I mean he

1   used that language.

2       I appreciate the fact you're arguing that's dicta and was

3   not central to the case, but this is Judge Posner.  Has a

4   fairly wide and -- wide reputation would be fair to say, and he

5   is in the forefront of stretching the ADA to accommodate to the

6   changes in business over the past couple of decades by using

7   language by that.  Do you dispute that?

8           MS. OUELLETTE KLAUSNER:  With all due respect to

9   Judge Posner, and he's a well esteemed judge, I have a lot of

10  respect for him, in this case it's our view that he didn't

11  actually find that a web site was a place of public

12  accommodation.  He listed it.  He said it, but there was -- the

13  entity involved was an insurance company.

14      So this again was not -- there was no -- the Defendant was

15  not a virtual business.  That wasn't what he -- the question he

16  was addressing.  He listed it.  He cited the Carparts opinion

17  suggesting that if it were up to him he would agree with what

18  Carparts has also said in dicta, but the issue is not before

19  the Court.

20      On the other hand, the issue has been squarely before the

21  Third Circuit, the Sixth Circuit, and the Ninth Circuit.  All

22  of those courts have been specifically and squarely presented

23  with the question.

24          THE COURT:  What's interesting about the Sixth

25  Circuit cases, in particular Parker, all involved customers who

1 actually obtained policies through their employer not directly

2 from the insurance company, and so therefore there is

3 theoretically an argument to be made, which I'm sure that you

4 recognize, that there's insufficient nexus because there's a

5 third party which gets in between the seller of the insurance

6 policy and the customer.

7        Isn't -- aren't the Sixth Circuit cases involving

8 employers who are actually providing the insurance policy

9 coverage?

10            MS. OUELLETTE KLAUSNER:  There -- one of the Sixth

11 Circuit cases we cited was involving insurance coverage.

12            THE COURT:  Oh I thought both of them were.

13            MS. OUELLETTE KLAUSNER:  The Statenborough case.  So

14 there's -- there's four.

15            THE COURT:  I thought the Parker and the

16 Statenborough cases both involve employers, employer providing

17 the insurance coverage, and so therefore there's necessarily a

18 break in the nexus between the customer and the insurance

19 company, isn't there?

20            MS. OUELLETTE KLAUSNER:  So the Statenborough case

21 was not about insurance at all.  The Statenborough case raises

22 --

23            THE COURT:  Well maybe it's not the Statenborough,

24 but it was the other Sixth Circuit case I had thought, but

25 correct me if I'm wrong.

1          MS. OUELLETTE KLAUSNER:  There's the Fourth Circuit

2     case and a Third Circuit case that address insurance provided

3     by an employer and they both adopt the nexus approach saying

4     that because the insurance was purchased not from the insurance

5     office, which would be a place of public accommodation, but

6     from the employer, which is not, there wasn't a sufficient

7     nexus to a place of public accommodation which has to be a

8     physical -- those cases say it has to be a physical place

9     somebody goes to, to purchase the product.

10          The Statenborough case, though, if the Court has not

11     focused on that case, it's worth reading it very carefully.

12     There you had a service that was much more akin to the service

13     that's offered by Scribd.  So TV networks offering TV

14     programming.  These were sporting broadcasts and what the Court

15     there said is, you know, we're looking -- they looked at the

16     categories of public accommodations and said these just -- this

17     -- these media services are not listed.  Congress didn't

18     include services like that.  The District of D.C. did the same

19     thing in the case against the Washington Post.  So you have a

20     case that says television networks are not subject to Title 3

21     of the ADA.  They are not like any of the physical places where

22     people go to get these types of services.

23          A newspaper is not a place of public accommodation even

24     though it clearly is a good provided to the public and it

25     provides information and entertainment.  It is the operator.  A

1  newspaper publisher is not a place of public accommodation.

2      There's another case from the Northern District of

3  California that says the provider of digital subscription TV

4  cable programming is not subject to Title 3 of the ADA.  Again

5  because this is a media company that is providing content to

6  people in their homes or in a bar or a restaurant or a hotel,

7  but somewhere that is not a place, a physical facility,

8  operated by the Defendant.  It's provided somewhere else and

9  those are -- these courts have all found that those are very

10  different circumstances.

11      Congress did not -- there's no indication from the statute

12  that Congress meant to cover any of those businesses.  In 1990

13  there were magazines, there were book publishers.  These are

14  not new things.  There were television networks.  None of them

15  is listed in the statute because Congress intended to cover

16  facilities that people go to.

17      That's not to say Congress only meant to provide physical

18  access, that's a different question, and the Second Circuit has

19  said no the ADA provides more than physical access.  If you are

20  a place of public accommodation, then you need to make your

21  goods and services equally available regardless of how they are

22  provided.

23          THE COURT:  So do you find it a little bit

24  incongruous to think that under your theory of place of public

25  accommodation there has to be a building, a structure, that's

1  available for public entry, and if you have one of those,

2  whatever services you provide are subject to ADA regulation

3  when in fact if by chance you decide not to have a building

4  which is open to the public, then whatever services you provide

5  are not subject to ADA regulation or control.

6          MS. OUELLETTE KLAUSNER:  I don't think --

7          THE COURT:  Don't you think that logically is

8  inconsistent?

9          MS. OUELLETTE KLAUSNER:  No I don't because I think

10  if you look at the statute, it's very clear that Congress

11  wasn't trying to regulate every single American business that

12  affects commerce and offers a service to the public, right.  If

13  that's what Congress wanted to do, you wouldn't need this; all

14  these pages, right.

15      Congress would just say Title 3 of the ADA applies to any

16  business that affects commerce and offers a good or service to

17  the public.  Period.  That would have been very, very simple.

18  Obviously Congress didn't do that.  Congress very carefully

19  listed very specific categories of places that are all physical

20  places open to the public.

21          THE COURT:  And Congress also indicated during the

22  course of passage of ADA in 1990 that this was to be a flexible

23  particular document.  That as technology changes over the

24  decades this is a protection for disabled people which is

25  extremely important, and there should be some flexibility as

1   time evolves when changes in technology suggest that there's

2   different modes of distribution.

3           MS. OUELLETTE KLAUSNER:  So --

4           THE COURT:  Doesn't it?  Didn't they say that?

5           MS. OUELLETTE KLAUSNER:  They did, but what Congress

6   was referring to there was the goods and services and the aids

7   that would be provided by the entities.  Congress did not say

8   that these specified and what Plaintiffs have recognized it's

9   an exclusive list of 12 categories.  Congress didn't say that

10  Courts or the Department of Justice or anybody could expand

11  that list.  The list is the list.  That's what the law is.

12  What Congress said is the types of technologies that can be

13  provided to persons with disabilities should develop as

14  technology develops.  It's a very different question.

15      So I did want to just raise the question sort of big

16  picture why are we here, right.  This is you have a company

17  that's based in California.  If the Plaintiffs had filed suit

18  against Scribd where it's located in California, there's no

19  question that the complaint would have been dismissed.  It

20  would have been dismissed if they had filed suit anywhere in --

21          THE COURT:  Because the law in the Second Circuit is

22  different than the law in the Ninth, is that what you're

23  suggesting?

24          MS. OUELLETTE KLAUSNER:  Well I'm suggesting --

25          THE COURT:  Because we are in the Second Circuit.

1        MS. OUELLETTE KLAUSNER:  Correct.  We are in the

2   Second Circuit and the Second Circuit has yet to address this

3   issue.  This is a case where the Plaintiffs are trying to

4   change the law.  They are trying to get a different outcome

5   than they would get in virtually anywhere else in the United

6   States and not because Second Circuit requires that.  I mean

7   Pallozzi did not address this issue and it said insurance

8   office is listed it's a place of public accommodation.  There

9   was no purely virtual business before the Court.  It was a

10   different question.

11      Now they are trying to change the law and they are trying

12   to create a split within the Circuit.  Shortly after the

13   statute was passed the Eastern District of New York Judge

14   Gleeson, very respected judge in the Eastern District, looked

15   at the statute, considered the Parker case, considered the Ford

16   case, and considered the Carparts case.

17        THE COURT:  This was before Pallozzi was decided.

18        MS. OUELLETTE KLAUSNER:  Correct.

19        THE COURT:  That was before Pallozzi was decided.

20        MS. OUELLETTE KLAUSNER:  Correct.  That was before

21   Pallozzi was decided, but he followed Parker and Ford, and

22   Pallozzi in footnote -- I believe it's footnote four, the

23   Second Circuit went out of its way to say what we're doing here

24   is not inconsistent with those decisions.  Those were -- those

25   decisions, Ford and Parker, were addressing a different issue

1    and that the Court there said -- I want to see if I can find

2    the quote here -- said Pallozzi and Ford quote "are not to the

3    contrary."

4       So the Second Circuit was not trying to create a split

5    among the Circuits.  The Second Circuit was trying to decide

6    the specific issue presented before it without creating that

7    split.

8            THE COURT:  And remind me when the Second Circuit in

9    Pallozzi said we are not overruling at least -- not overruling

10   Parker or Ford, but weren't they talking about the fact that in

11   Parker and Ford the employer was in fact the distributor of the

12   insurance policy and wasn't that discontinued in Pallozzi?

13           MS. OUELLETTE KLAUSNER:  Well in the footnote where

14   the Second Circuit addressed Parker and Ford, the Second

15   Circuit references the fact that those courts had adopted the

16   nexus approach, and so that the service at issue or the good or

17   service at issue is being challenged, is discriminatory, has to

18   be offered by an entity with a nexus to a physical place open

19   to the public, and the Court went on to say here that nexus

20   exists because the Plaintiff had purchased their insurance

21   directly from Allstate.

22           THE COURT:  You know I mean just logically it seems

23   to me that if the ADA was just protecting disabled people from

24   dangerous circumstances in a physical plant I would understand

25   your argument, but when in fact you just say that's a threshold

1  that there has to be some sort of physical building, and that

2  once you have reached the threshold there's a physical

3  building, then the product itself is governed by ADA.  It's a

4  logical inconsistency.  I mean if the ADA just dealt with, you

5  know, whether the stairs complied with regulations, that's one

6  thing.  I would understand that, but if this is just a

7  threshold and then the courts are obligated once a threshold is

8  met to look at the product itself, it really -- the idea of

9  just having a building makes no logical sense, does it?

10         MS. OUELLETTE KLAUSNER:  Well it's not so much a

11  building, it could be an outdoor exhibit, it could be an

12  amusement park, it could be a beach, it could be a tennis

13  court.  So -- but it is a physical place that people go to and

14  it comes --

15         THE COURT:  Why is that important?  Why is the

16  physical place important if in fact what the ADA is ultimately

17  doing is controlling or defining or regulating the safety or

18  the provisions made or services made in a product?  Who cares

19  about the physical building?

20         MS. OUELLETTE KLAUSNER:  Because it was also -- I

21  mean quite a bit of the ADA was about physical access to

22  buildings.  It was not limited to that, but it was about that,

23  and if you look at the -- if you look at the Department of

24  Justice's regulations about barriers which Plaintiffs are

25  invoking here, they are all talking about architectural barrier

within a physical building or structure, and this is just from the language of the statute.

I can't speak to Congress's motives, but Title 3 says that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by a person who owns, leases, leases to, or operates a place of public accommodation.

So Congress was directing the statute at two requirements. There has to be somebody who is operating, owning, or leasing a place of public accommodation, and then the statute applies to that entity and it prohibits the operator of that facility from discriminating in whatever goods and services it's providing.

So it's based on the language of the statute. At the time the statute was passed the internet was not in wide use so Congress wasn't thinking about the internet. Web sites are not mentioned in the statute. They are not mentioned in the legislative history. The Department of Justice has recognized that it's not something Congress was thinking about, but it's very important to note Congress, that is, thought about the internet in Title 3 since the statute was passed. Congress amended the Rehabilitation Act in order to specifically have it cover web sites.

THE COURT: You're suggesting because they amended the Rehabilitation Act to make the internet applicable to the

Rehabilitation Act and they didn't do that with the ADA then of course they must have intentionally decided not to have the ADA cover the internet, but in fact Congress had been given at least that letter in 1996, and the Department of Justice had been arguing for a decade at least that in fact the internet was covered by the ADA. So it's not like they would have thought oh it's clear that the ADA does not cover the internet.

In fact, what seemed to be the thrust of the debate in Washington was that in fact the internet was covered by the ADA. So why -- why go back to the ADA and change the law if in fact the Department feels the ADA covers the internet. There is some case law in the First Circuit and now the Seventh Circuit and some could argue in the Second Circuit that the ADA covers the internet. So why change it?

MS. OUELLETTE KLAUSNER: Well it wasn't just that Congress amended the Rehabilitation Act. It's that Congress also has amended the ADA. Congress amended the ADA to address the fact that courts initially when they were interpreting the term disability had been interpreting it in a very narrow way that Congress had not intended. At that time these cases, the Parker case, the Ford case, they had all already been issued. There was a clear body of authority that said a place of public accommodation is limited to a physical place open to the public. That was brought to Congress's attention so they went ahead and amended the statute to address one concern that had

1  been raised about how courts had been interpreting the ADA and

2  they did not address the other one, and there are cases that we

3  cited in our brief that were the Second Circuit that said

4  that's something that's worth noting.  It does suggest that

5  Congress meant to leave the law the way that it had been

6  interpreted at that point in time.

7          THE COURT:  So what did you think of Judge Ponsor's

8  decision in the Netflix case and why is that not good guidance

9  for the Court in this particular case?

10          MS. OUELLETTE KLAUSNER:  So Judge Ponsor I believe

11  thought he was bound by Carparts.  Carparts actually did not

12  actually hold that a purely virtual business or a business that

13  doesn't have a physical facility that's open to the public is a

14  place of public accommodation.  The First Circuit in Carparts

15  said, first of all, they said this case needs to be reversed

16  because the Court dismissed an amended complaint without giving

17  the Plaintiff notice and opportunity to be heard.  That was the

18  actual holding of the decision.

19      The Court went on to provide what it called guidance to

20  the District Court, and it did say that we don't think that

21  it's necessarily the case that places of public accommodation

22  are limited to a physical structure.  That was dicta.

23      Judge Ponsor felt bound by those statements, and with

24  respect to the first -- I'm sorry, to the District of

25  Massachusetts he just got it wrong.  I mean he considered the

1  statutory canon that says where you have a term that indicates

2  another type of something that you have to construe it to be

3  similar to the things that precede it.  He recognized that was

4  a canon, but then he just completely disregarded it because he

5  said but these are services of the place of public

6  accommodation.  The two things just don't logically flow.  It

7  doesn't answer the right question.

8      There is that one case out there.  There's the first --

9  I'm sorry, the District of Massachusetts has said that a purely

10  virtual business Netflix, which has a video streaming business

11  that, you know, could be analogized to Scribd's business, they

12  said it's covered by the ADA.  That's the only case in the

13  country that has ever said that.

14      Like I started off saying, if this case had been brought

15  in the Third Circuit, the Ninth Circuit where Scribd is

16  located, in the Sixth Circuit, in the District Courts in

17  Montana, the District of D.C., the Eastern District of New

18  York, all of those courts would say that Scribd is not as

19  alleged in the complaint a subscription online digital reading

20  service, is not a place of public accommodation.  It's not a

21  place of public accommodation both because its service just

22  really isn't like any of the things that are listed in the

23  statute.  It's more like a newspaper or a magazine publisher,

24  but also because it doesn't operate, there's no allegation in

25  the complaint that it operates a facility, that's the term used

1 by the Department of Justice, and in its official regulations

2 which remain on the books today it doesn't operate a facility

3 where people can go and obtain in-services.  Thank you.

4          THE COURT:  All right.  Thank you.

5          MR. GOLDSTEIN:  Good afternoon, Your Honor.  I think

6 I should start by putting on the record that this morning in a

7 Supreme Court case called Direct Marketing Association versus

8 Colorado Department of Revenue, Justice Kennedy in a concurring

9 opinion, and indeed what is clearly dicta but dicta I thought

10 was worth bringing to the Court's attention --

11          THE COURT:  It was a totally different issue.  I mean

12 I read that particular concurring -- or even that section of

13 the concurring opinion.  It is dicta, but it is really talking

14 about how the internet is changing the world of business.

15          MR. GOLDSTEIN:  That's correct, Your Honor, and the

16 fact that the internet has afforded people without disabilities

17 such extraordinary access to a variety of goods and services,

18 some of which can only be available on the internet even if

19 they are the traditional kind that are listed in 121817.  For

20 example, what you can't do at a physical travel service which

21 you can do at Kayak is compare 15 different hotels and the

22 prices that five different people offer those same hotels at.

23 This is -- this is a new kind of access to information,

24 exchange of information, and some of these establishments

25 really can only be accessible to people with certain

1   disabilities by virtue of being on the internet.

2       Scribd is a great example of this.  Can you imagine

3   housing four and a half million pieces of textbooks and books

4   and articles --

5           THE COURT:  40 million.

6           MR. GOLDSTEIN:  Sorry.

7           THE COURT:  I thought it was 40 million.

8           MR. GOLDSTEIN:  I don't usually get accused of

9   understatement, but I think I just did.  40 million.  Which if

10  they have access to would make their blindness irrelevant with

11  respect to a massive quantity of information.

12          THE COURT:  Let me ask you to respond to the

13  representation that the Ninth Circuit has said there needs to

14  be a physical place, the Third Circuit has said there has to be

15  a physical place, the Eleventh Circuit says there has to be a

16  physical place.  Is that right?

17          MR. GOLDSTEIN:  Well they certainly have, and I would

18  pose the question to the Court that the Court needs to decide

19  this way.  Let's assume the Third, Sixth, and Ninth Circuits

20  came up with a reasonable interpretation of Title 3, and let's

21  suppose also Judge Posner and the Court in Carparts came up

22  with a reasonable interpretation.  What is the Court's duty if

23  the term is ambiguous?  That is to say there are at least two

24  reasonable interpretations, and we're very fortunate that we

25  have Supreme Court guidance on how to interpret 12187 because

1  in PGA versus Martin what the Supreme Court said about the

2  particular section that you're being asked to construe today

3  was that the phrase public accommodation is defined in terms of

4  12 extensive categories, which the legislative history

5  indicates should be -- I'm quoting here directly -- "construed

6  liberally to afford people with disabilities equal access to

7  the wide variety of establishments available to the

8  non-disabled."

9      Now what I suggest that instruction of liberal

10  construction means is if we go, as I propose to in a minute, to

11  the analytical framework of Robinson versus Shell Oil Company

12  that you used in Conservation Law Foundation and cited by the

13  Defendant in this case, to look at whether place of public

14  accommodation is ambiguous, if you conclude it is because

15  you've got some very smart Circuit Court judges on both sides

16  of this issue, then your obligation I suggest is to carry out

17  the Congressional intent to have the ADA be a clear and

18  comprehensive mandate, and the Congressional intent that 12187

19  was designed to be very elastic to cover future changes as you

20  suggested with the statutory history.

21      I think we need to be clear, though, about what the

22  construction task is, and if I may, Your Honor, I would suggest

23  that Scribd has taken the position that there are two qualities

24  to the word place that they would like you to insert that are

25  not either inherent to the word place nor are they implied by

1  the context.  One is the word physical and one is the word
2  public, and they want both of those because if only one of
3  those is implied, let's say it has to be a physical place, then
4  as you raise the question don't they have an office, yes but
5  the office is not public, or if it doesn't have to be public
6  but can be -- excuse me, that was public.  If it doesn't have
7  to be -- if it can be virtual, then again they lose.  So it has
8  to be both physical and public in order for Scribd not to be
9  the kind of library service or sales and rental establishment
10  that is covered by the term.  So in essence our position is if
11  there's a jump ball the possession arrow goes to the Plaintiff.
12      Why do I say that they insist on both?  If you look just
13  at the preliminary statement from their opening brief, they say
14  Scribd operates no physical facility open to the public.  They
15  describe Scribd's lack of a physical public facility, and they
16  say at the end of their preliminary statement Title 3 does not
17  apply to those whose goods or services are not made available
18  to the public through a physical location open to the public,
19  but physical and public are neither implied nor stated, and
20  what they are seeking to have you do is to come up with a craft
21  definition by extending the scope of the word place to
22  incorporate those two --
23          THE COURT:  So if the word physical applies, what
24  you're suggesting there is a building, the building in San
25  Francisco.  The building in San Francisco houses the computers

1  they work on which create the access, the web sites, et cetera,

2  and that that is a sufficient nexus if it's just physical, but

3  it also has to be public.  That's what --

4        MR. GOLDSTEIN:  They are saying it's not enough it's

5  physical it has to be public, or conversely that at least it

6  has to be -- well yes it has to be both.

7        One of the interesting things when we look at the way the

8  terms are used in the statute is that it's not a prohibition of

9  discrimination by places of public accommodation, but merely

10  prohibition of discrimination by public accommodations.  The

11  word place then appears in the description, and I'm going to

12  suggest that that is descriptive rather than limiting language,

13  and the reason I would suggest that is if we also look at the

14  definition of public accommodation, we again see what they are

15  defining as public accommodation, and the place appears in an

16  interesting place so to speak.  It appears when Congress is

17  trying to expand the definition.  The word other proceeds its

18  use over and over again, but the other interesting thing is

19  Congress doesn't consistently stick with the word place.

20  Sometimes they say establishment, and we don't want to hang too

21  much on a single word.

22        I was thinking about this last night.  When else has there

23  been a significant construction of the word place, and of

24  course the answer is the Fourth Amendment Katz versus United

25  States.  Very famously.  The Fourth Amendment protects persons

1    not places, even though what is talked about and presumably

2    Congress wasn't thinking about wire taps and recording -- not

3    Congress rather but the radifying states weren't thinking about

4    recording oral conversations when it said that a warrant has to

5    particularly describe the place to be searched and the persons

6    or things to be seized when the thing to be seized was

7    intangible, oral conversations, and there was no place to be

8    searched because if you remember Katz, the big jump was from

9    the microphone and how far did it penetrate into the wall of

10   the adjoining hotel room, to not being in the phone booth at

11   all, and it was something intangible that was being protected

12   despite that language.

13       Well I think here too when you look at what did Congress

14   intend by public accommodations, and here I can agree with Ms.

15   Klausner, they weren't trying to say that newspapers, I don't

16   -- newspapers are physical by the way, but newspapers are a

17   place of public accommodation because that's not one of the

18   services that's listed here.

19            MS. OUELLETTE KLAUSNER:  I'm sorry.  Can I interrupt

20   for a second?  We don't have access to it.

21            MR. GOLDSTEIN:  I'm terribly sorry.  Let me show you,

22   I have the text of 121817 public accommodation, with the

23   Court's indulgence.

24            MR. KARNEDY:  Sorry, Your Honor.

25            MS. OUELLETTE KLAUSNER:  I just needed to see what he

1  was showing to the Court.  Thank you.

2          THE COURT:  He was not trying to express a subliminal

3  message.

4          MR. KARNEDY:  There we go.

5          MS. OUELLETTE KLAUSNER:  Just being careful.  That's

6  what lawyers get paid to do.

7          THE COURT:  I understand.

8          MR. GOLDSTEIN:  One of the interesting things, and I

9  don't quite have it on the screen, is H; a museum, library,

10  gallery, or other place of public display.  Now if place

11  imports public you wouldn't need to say public display, right?

12  It would be a place of display because everybody knows a place

13  means a public place, and having the word public appear only in

14  front of accommodation doesn't imply anything about the place,

15  and that's simply demonstrated if you just reverse the words

16  that there shall be no discrimination at a public place of

17  accommodation.  That doesn't mean anything.

18     Public accommodation is a compound noun that talks about

19  places that -- and Pallozzi got this right.  That it's about

20  delivering certain kinds of goods and services, advantages and

21  benefits to the public.  That's what this provision is all

22  about, and that's why the Seventh Circuit got it right and

23  that's why the First Circuit got it right.

24          THE COURT:  And you're suggesting the Second Circuit

25  got it right?

1          MR. GOLDSTEIN:  Yes.  I mean I -- I thought -- well

2   it doesn't make sense for the Second Circuit to say what it

3   did, and it didn't say with all respect that Allstate has a

4   bunch of insurance offices.  It said we don't care whether it's

5   an insurance office or an insurance company.  Looking at the

6   kind of services and given that what's protected here are the

7   services of certain kinds of a public accommodation, Allstate

8   you're covered by the ADA, and to draw the line as Scribd would

9   have it, it draws a line that requires you to construe the

10  statute in a way that makes no sense because as Scribd would

11  have it if a company sells life insurance door-to-door, and

12  when I was growing up that's the way a lot of life insurance

13  got sold and got paid for each week, then there's no public

14  place of accommodation from the perspective of Scribd and they

15  can discriminate, and if Allstate simply goes entirely to its

16  subsidiary esurance and becomes a virtual company, it and every

17  other insurance company can escape the confines of the ADA or

18  they can do it low tech and simply sell insurance over the

19  phone like a lot of folks do.

20          THE COURT:  So why did not -- why did Congress not

21  deal with this particular issue?  They were concerned about the

22  Rehabilitation Act and whether the Rehabilitation Act was going

23  to be covering the internet.  Why at that same time did they

24  not deal with ADA?

25          MR. GOLDSTEIN:  Well they were dealing with -- with

1    an entirely different issue with 508 that I don't think -- I

2    don't quite figure out how you would do it in the ADA context.

3    Let's be clear.  Section 501 with respect to federal employees

4    and 504 of the Rehabilitation Act with respect to any entity

5    that receives federal funding is forbidden from engaging in any

6    program or activity that discriminates on the basis of

7    disability.

8        So that means what we already know which is if you get

9    money from the Feds or if you are the Feds, you can't go out

10   and have a web site that's inaccessible.  508 dealt with a very

11   different issue.  508 deals with federal government procurement

12   with respect to electronic technology, electronic information

13   technology, and what 508 instructs, and I hope some day the

14   federal government decides to observe it, but what 508

15   instructs is buy accessible.  Feds buy accessible.  Don't go

16   out and buy phones with soft buttons that is needing changes

17   depending on what's on the screen of your phone.  Don't go out

18   and use Google Docs for your employees so that they can't --

19   the blind employees can't know what's going on in the office

20   when they try to collaborate.

21       508 is directed to federal procurement and one perfectly

22   good reason for the federal -- for the Congress never to have

23   amended the ADA is that it didn't need to.  It thought it had,

24   and I suggest it did, create a comprehensive mandate that was

25   intended to be flexible over time.

1    So if -- and I mentioned Robinson before and Conservation.

2   You look at the term itself, you look at the context in which

3   it's used, and then you look at the overall statute, and if

4   it's still ambiguous, then you can look at legislative history.

5   The term I suggest is ambiguous because of the split in the

6   Circuits because it requires inferring physical and public when

7   that's neither necessary for in furtherance of the purpose of

8   the statute.

9    I also would suggest that when you look at common usage we

10  can't talk about the internet without using the language in

11  place.  We visit a web site.  We don't visit a television

12  station or a newspaper.  We listen to the or watch the

13  television station and we read the newspaper, but we visit a

14  web site.  When the Burlington Free Press tells those who want

15  to know how to help rebuild the Green Mountain Club in the wake

16  of its fire visit the club's web site, I don't think the

17  Burlington Free Press is being poetical and metaphorical.

18  That's the language we all understand.  We visit a web site.

19  We don't speak of cyber.  We speak of cyberspace.  We talk in

20  chat rooms.  We post news on Facebook walls.  We have e-mail

21  addresses.  We shop at online stores.  When the Times Argus

22  says in 2001 the internet is not just a place but lots of

23  places, again I don't think they are being metaphorical.

24  That's language we all understand it and we understand it the

25  first time we hear it.  We understand web site.  That's a web

1   place in the common understanding of the word site.

2       Scribd itself in its history, and we just put this in our

3   brief, describes itself repeatedly as a place and they try to

4   dismiss that as metaphor.  Metaphor is the former Governor of

5   Oklahoma writing you are my sunshine my only sunshine addressed

6   to somebody who is not the sun and doesn't radiate light.  This

7   is not a metaphor.  It is really hard if you take just one of

8   the statements we quote, Mr. Adler's statement that Scribd is

9   the place where connections form around sharing reading

10  interests.

11          THE COURT:  That may be the common meaning, but the

12  problem with that argument is that this statute was passed in

13  1990.  The question is what did place mean at the time of the

14  passage of the statute in the first place, and if in fact

15  Congress at that point felt that there should be this physical

16  property threshold to the application of the ADA, then they

17  must have been talking about something other than the internet.

18  They must have been talking about some physical building --

19          MR. GOLDSTEIN:  If they were --

20          THE COURT:  -- location.

21          MR. GOLDSTEIN:  If they were, then again the question

22  is they are talking about a public building, but also why then

23  do they abandon the word place in the oddest places.  They use

24  establishment instead of place.  They define public

25  accommodation but not place of public accommodation, although

the regulations do, and I'll address that in a minute.  Why
don't they use it in the heading of the statute that is the
core of Title 3 defining what's prohibited, and it's because
place is not an operative word.  It's a descriptive word, and
one way to see that is when you try to change, for example, a
bakery, grocery store, clothing store, hardware store, shopping
center, or other sales or rental establishment, if you want to
use place you have to say or other place.  I think you have to
say or other place where sales or rentals occur or something.
I mean it's too clunky.  They weren't trying to -- to limit
something.  They were just trying, whether they used place or
establishment, to describe something, and they used it over and
over again when they are saying or other to make it as broad as
they knew how to do using the English language, and knowing
that they lived in an age of technology where -- which they
acknowledge in the statutory history which was going to affect
the way the ADA worked.

   I'm not going to talk about the context because we've
already talked about Pallozzi.  I think of the place is the
context.  I just want to point to one oddity in terms of the
kind of arbitrary lines you would have to follow if you
insisted that it be a physical public place.

   In 1931 the Pratt-Smood Act established the National
Library Service for the blind and physically handicapped, and
the blind don't come to Washington to get their books.  They

1   are sent them and the notion that well if there's no public

2   reading room then there's no public accommodation really -- it

3   really wouldn't make much sense in terms of what the statute is

4   designed for.

5       I also would point out given the sort of all that we're

6   trying to put on the word place it was interesting the quote

7   from Martin about construction.  It talks about the wide

8   variety of establishments.  Even the Supreme Court did not feel

9   the need in describing 12187 to talk about place.

10      Now we've heard from Scribd that facility as it's defined

11  in the regulations is a limiting factor.  Place of public

12  accommodation is defined in the regs as a facility and facility

13  in turn is defined, and I think it's interesting, first of all,

14  facility means all or any portion of buildings, structures,

15  sites, et cetera, that I think throws a lot of cold water on

16  the notion that the place needs to be a public place.  That

17  Scribd's offices don't do the trick, and all or any is again

18  the most broad possible language, and to get to where Scribd

19  wants you have to read all or any to be any public portion and

20  skip the all or any, any public portion of any, and it's simply

21  not implied, but the other thing is that if you go on and read

22  the definition further it covers personal property.  Not

23  tangible personal property.  Facility even covers personal

24  property, which I would suggest a web site is, and it also

25  covers equipment which servers most certainly are -- computer

1  servers most certainly are.

2  So there's nothing really about facility that knocks us

3  out of the ball park.  To the contrary.

4  THE COURT:  Well even -- even if the internet did

5  fall within the language or within the meaning of facility,

6  what you're suggesting is when you use facility and say that

7  also includes equipment or things other than a physical

8  building, what you're suggesting is that it's a much broader

9  concept than just a physical building which is open to the

10  public, which is I think the argument that the Defendant is

11  making.

12  MR. GOLDSTEIN:  That's correct, Your Honor.  Finally

13  Robinson and Conservation Law tell us to look at the statute as

14  a whole.  If you look at the statute as a whole, we look at the

15  findings and purposes of the ADA, and those findings note that

16  what prompted the statute was that persons with disabilities

17  are being denied the right to fully participate in all aspects

18  of society, including discrimination in public accommodation

19  and in communication, and noted the discriminatory effects of

20  communication barriers.  By the way barriers is another

21  interesting word because that's what we're complaining about

22  here and I guess that imports physical, but it need not.

23  And then the purpose section says that the ADA is to

24  provide a clear and comprehensive mandate for the elimination

25  of discrimination against individuals with disabilities.  So

1  when we see the purpose and we remember that we've been told

2  since Tcherepnin versus Knight that remedial statutes are to be

3  broadly construed, I think what Scribd has to do is convince

4  you that the only possible interpretation is the place means a

5  physical public place because if not, then construing it

6  liberally in line with its remedial purpose requires concluding

7  that place does not necessarily require those categories and

8  that they are included.  If the Court will indulge me just one

9  moment.

10          THE COURT:  Yes.  Okay.

11          MR. GOLDSTEIN:  You had posed the question to Scribd

12  about how Pallozzi distinguished Parker and Ford, and I think

13  it's clear that it distinguishs them on the basis of nexus, and

14  the reason I think that's clear is that the Leonard F. case

15  comes out shortly after Pallozzi where Leonard F. did not buy

16  his insurance directly from the insurance company but the

17  employer, and there the Second Circuit did follow Parker and

18  Ford because the services were not of the place of public

19  accommodation, the insurance agency.  They were services of the

20  employer which is not covered under Title 3.

21      You asked me a minute ago, and I should have mentioned

22  this when you said what do we do about the fact that internet

23  was in the future.  It may have been foreseen, but it was in

24  the future, and I would point out that the consequence of

25  requiring that the place be physical and public eliminates not

1    only the internet it eliminates business that is conducted

2    exclusively by phone, and that was clearly not Congress's

3    intent.  So if Congress intended to cover business by phone

4    there's no conceivable reason why it should have excluded

5    business by internet.  Unless the Court has further questions

6    --

7              THE COURT:  No.  That's fine.

8              MR. GOLDSTEIN:  Thank you.

9              THE COURT:  Okay.  Any response?

10             MS. OUELLETTE KLAUSNER:  So first I just want to

11   point out that the -- I have not read the Direct Marketing

12   Association case.  Counsel sent me an e-mail while we were on

13   our way out to lunch.

14             THE COURT:  Well I didn't either, but I read a

15   particular paragraph that Justice Kennedy wrote about the

16   significance of the internet in today's world and how it really

17   suggests to the Supreme Court that they should be reconsidering

18   its impact in a number of areas.

19             MS. OUELLETTE KLAUSNER:  I have not read it, but my

20   understanding it's not an ADA case, but I'm not sure whether

21   the Court would like us to address it.  If so, I would like to

22   submit a brief on it.

23             THE COURT:  I don't think it's necessary.  No.

24             MS. OUELLETTE KLAUSNER:  So Plaintiffs argue that the

25   statute ADA needs to be construed liberally and that the

1    Supreme Court has said that and that's true, but they have

2    taken it too far.  While Title 3 may need to be construed

3    liberally it's very well established that a statute cannot be

4    construed in a manner that doesn't give effect to every term in

5    that statute.  The important term here is place.  So counsel

6    has stated that well place --

7              THE COURT:  What about the word public?  I mean

8    counsel has raised a question about public.  I mean basically

9    what you're suggesting is that it has to be a physical space

10   but it also has to be open to the public.

11             MS. OUELLETTE KLAUSNER:  Yes.

12             THE COURT:  Where do you get that?

13             MS. OUELLETTE KLAUSNER:  So there are several places.

14   First of all, the statute only regulates entities, private

15   entities that operate a place of public accommodation.  It's

16   not anyplace.  It's not a business that operates any facility.

17   It's a place of public accommodation.  That's -- that's the

18   premise of the statute and who it covers.

19       It also comes from the three reasons -- that's number one.

20   Number two --

21             THE COURT:  May I just go back to that?  Just the

22   word public accommodation you're suggesting is that has to be a

23   physical structure which is open to the public.

24             MS. OUELLETTE KLAUSNER:  Yes.

25             THE COURT:  Judge Posner would suggest to you that

1   the internet may very well be public accommodation focusing

2   more upon the service as well as opposed to the physical.

3        Now I appreciate the fact those are totally different

4   approaches to public accommodation, but does the fact that

5   there is that significant difference of view about what public

6   accommodation means suggest that it is ambiguous and that

7   therefore the Court should go to the next step of Congressional

8   interpretation?

9        MS. OUELLETTE KLAUSNER:  No.  We submit that the

10  statute is not ambiguous at all.  When -- when you look -- this

11  is the second point I was going to make, is that even

12  Plaintiff's counsel can see you have to view the language of

13  the statute in its context, and here in the 12 categories of

14  public accommodations identified by Congress every single one

15  of them is a public place of -- I'm sorry, a place that is open

16  to the public, that's what they are, and the Second Circuit has

17  endorsed the canon of, and I apologize if I mispronounce this,

18  it's in latin, noscitur a sociis.

19       THE COURT:  I think that's pretty good, but what I

20  find really quite interesting is that I appreciate the fact

21  that you're really focusing upon the physical structure and as

22  reflected in those 12 different descriptions, but other judges

23  have looked through that -- those 12 different descriptions and

24  they have found not only evidence of physical structures but

25  also services, and I was thinking I'm not sure whether it was

1   Judge Posner or Judge Ponsor, one or the other, focusing upon

2   travel services as just an example of those descriptions

3   reflecting both physical structure as well as services, and

4   that therefore the definition of public accommodation according

5   to them may be in the services being described.

6           MS. OUELLETTE KLAUSNER:  Well I believe it was the

7   Carparts query that focused on travel service.

8           THE COURT:  I'm sorry.  Right.  They are blending

9   together.  Okay.  All right.  So what about that?

10          MS. OUELLETTE KLAUSNER:  So -- but what the Carparts

11  Court -- well, first of all, as I explained previously what the

12  Carparts Court said there was guidance.  I mean that's what the

13  Court called it.  The First Circuit said this is guidance.  So

14  they acknowledge that's dicta.  It's not binding, but in any

15  event they did go on to give a view, and they said here's a

16  travel service, but what the First Circuit did not do is apply

17  this latin doctrine that requires that a term is interpreted

18  within the context of the accompanying words to avoid the

19  giving of unintended breadth to the Acts of Congress.

20          THE COURT:  They literally did just that.  They went

21  through the 12 different descriptions and they suggested that's

22  not just a description of physical structures it's also a

23  description of services, and that's what public accommodation

24  meant I thought to them, and I thought the finding of the First

25  Circuit was really you go to the nature of the service really.

1          MS. OUELLETTE KLAUSNER:  The problem with going to

2     the nature of the service is that it renders the word place

3     superfluous.  Place, and Your Honor correctly stated that what

4     matters is what was the common and ordinary meaning of place at

5     the time the statute was written, and Plaintiffs don't

6     challenge the fact that one ordinary and plain meaning of the

7     word place was a building or other site where people go to.

8     There is nothing to suggest Congress meant anything other than

9     that.

10          Yes, are there other dictionary definitions of the word

11     place?  Sure, but none of them make sense in the context of

12     this statute and in the context of a statute that lists

13     specific types of facilities that are public facilities.

14          The other reason why I used the word public is because

15     that's the conclusion of multiple Circuit Courts.  So you have

16     in Ponsor, this is a panel of the Sixth Circuit, every judge on

17     the Sixth Circuit saying, this is a quote, "every term listed

18     in Section 121817 in subsection F is a physical place open to

19     the public."  That's what the Sixth Circuit said.

20          The Third Circuit said the same thing in the Ford case.

21     The Ninth Circuit said the same thing in the wire case.  All

22     the items on this list have something in common.  They are

23     actual physical places where goods or services are open to the

24     public.  Scribd doesn't operate any physical place where goods

25     or services are open to the public.

1          THE COURT:  So there is clearly a difference of

2     opinion, a Circuit split already existing between the First

3     Circuit at a minimum, the Seventh Circuit as well, and then the

4     Third, Sixth, and Eleventh, and Ninth.

5          MS. OUELLETTE KLAUSNER:  Well there's not a Circuit

6     split because the Seventh Circuit and the First Circuit what

7     they said they said in dicta.  So those courts did say

8     something that's different from what the other courts have held

9     when squarely presented was the issue, but I would submit

10    there's not a Circuit split.  There is a split between the

11    District of Massachusetts which squarely addressed the issue

12    and decided differently than every other court in the country

13    that's considered this issue.  If I can address another point?

14         THE COURT:  Do you know what happened to Judge

15    Ponsor's case, the Netflix case?  It's 2012 so was it appealed?

16         MS. OUELLETTE KLAUSNER:  No.  Netflix settled the

17    case.

18         THE COURT:  Okay.

19         MS. OUELLETTE KLAUSNER:  Which is unfortunate we

20    don't have the benefit of the First Circuit weighing in on

21    here.

22         Plaintiffs argue while Scribd does operate equipment and

23    equipment falls within the definition of facilities, if I can

24    just use their chart here, their quote from the statute, what

25    the Department of Justice has said it's not just that a

1    business has to operate a facility or operate equipment.  If it

2    did, every single business in America would be covered by Title

3    3.  That may be what Plaintiffs would like, but that's not what

4    the statute says and that's not what the regulations say.  It

5    has to be a place of public accommodation, means a facility.

6    So it has to be a facility.  It has to be physical; somebody

7    operating equipment or a building, but that facility has to

8    fall within -- and fall within at least one of the 12

9    categories listed in the ADA.

10        It's -- there are two parts to the test.  So it has to be

11    a place, a facility, and it has to fall within one of those

12    categories, and a subscription reading service, an online

13    publisher doesn't fall within any of those categories.  It

14    hasn't for years.

15        THE COURT:  Well -- but if -- I mean I don't want to

16    take the position that they would -- as to how they would

17    respond, but if they are basically -- basically suggesting the

18    facility is not just a physical structure itself but includes

19    equipment, as an example, you get the equipment which meets the

20    first prong and then you get library services or all kinds of

21    other broad definitions from some of those 12 listed examples

22    and seems to be what they would be arguing.

23        MS. OUELLETTE KLAUSNER:  Like I said it's the

24    facility.  So Scribd operates a computer service.  Assuming --

25    I mean that's actually not an allegation of the complaint, but

1  let's assume that they do.  So assuming that Scribd operates

2  equipment so they are operating a facility as defined by the

3  Department of Justice's regulations, but they have to fall

4  within one of the 12 categories.  Computers are not in hotels,

5  restaurants.  Computers are not libraries.  Computers are not

6  bakery or museums or parks.

7            THE COURT:  No.  They are the facility.  What they

8  are basically suggesting is the computer is the equipment; i.e.

9  the facility, and based upon that they are providing library

10  services because I mean essentially you're an online library,

11  aren't you?

12            MS. OUELLETTE KLAUSNER:  No.  It's not a library.

13  You don't check out books.  You don't go in and peruse things.

14  It is a -- the Plaintiffs in their complaint characterize it as

15  a subscription reading service and an online publication

16  platform.

17            THE COURT:  Well okay.  All right.

18            MS. OUELLETTE KLAUSNER:  All right.  Thank you.

19            THE COURT:  Thank you.  Okay.  Thank you and

20  appreciate very much your coming today and take it under

21  advisement.

22  (Adjourned at 2:45 p.m.)

23

24

25

1          C E R T I F I C A T I O N

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled  matter.

5

6                                    _____

7

8                                         JoAnn Q. Carson

9     March 5, 2015                  _____

10    Date                           JoAnn Q. Carson, RMR,CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25