**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

NATIONAL FEDERATION OF THE      :
BLIND, on behalf of its members :
and itself, and HEIDI VIENS,    :
                                :
        Plaintiffs,             :
                                :        Case No. 2:14-cv-162
    v.                          :
                                :
SCRIBD INC.,                    :
                                :
        Defendant.              :

## Opinion and Order

Plaintiffs National Federation of the Blind ("NFB") and Heidi Viens, a member of NFB residing in Colchester, Vermont, brought this suit against Scribd, Inc. ("Scribd"). The Plaintiffs' Complaint alleges that Scribd has violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, because its website and mobile applications ("apps") are inaccessible to the blind.

Scribd has moved to dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. ECF No. 13. Scribd argues that the Plaintiffs have not alleged facts demonstrating that it owns, leases, or operates a place of public accommodation because the ADA does not apply to website operators whose goods or services are not made available at a physical location open to the

1

public.  The Court disagrees.  For the reasons discussed below,
the Court **denies** Scribd's motion to dismiss.

## I.    Factual Background

According to the Complaint, Scribd is a California-based
digital library that operates reading subscription services on
its website and on apps for mobile phones and tablets.  Scribd's
customers pay a monthly fee to gain access to its collection of
over forty million titles, including e-books, academic papers,
legal filings, and other user-uploaded digital documents.

Scribd's digital software program is accessed over the
Internet.  The Plaintiffs contend that Scribd's website and apps
are inaccessible to the blind because they use an exclusively
visual interface and lack any non-visual means of operation.
Blind persons generally use screen reader software to convert
graphical information found on websites and apps into audio or
Braille formats, depending on the user's preference.  According
to the Plaintiffs, because Scribd's website and apps are not
programmed to be accessible through such software, Scribd is
denying blind persons access to all of the services, privileges,
advantages, and accommodations that Scribd offers and is
excluding them from accessing information critical to their
education, employment, and community integration.

Scribd contends that it does not operate any physical location open to the public, nor does the Complaint include such an allegation.

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court evaluating a motion to dismiss must accept the facts alleged in the complaint as true and draw all reasonable inferences from those facts in favor of the non-moving party. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). This assumption of truth does not apply to legal conclusions. *Davis v. Vermont, Dep't of Corrections*, 868 F. Supp. 2d 313, 321 (D. Vt. 2012)

## III. Discussion

To state a claim under Title III, a plaintiff must allege (1) that she is disabled within the meaning of the ADA, (2) that the defendant owns, leases, or operates a place of public accommodation, and (3) that the defendant discriminated against her by denying her a full and equal opportunity to enjoy the services the defendant provides. *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008). Scribd argues that the

Plaintiffs have not sufficiently alleged that it owns, leases, or operates a place of public accommodation.

The question at the heart of Scribd's motion is ultimately one of statutory construction. As in all such cases, the Court must first determine whether the language at issue has "'a plain and unambiguous meaning with regard to the particular dispute in the case.'" *United States v. Am. Soc'y of Composers, Authors, Publishers*, 627 F.3d 64, 72 (2d Cir. 2010) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). If a court can ascertain the plain meaning of the statutory text by examining the context of the statute as a whole, it need not proceed any further, but if the text's meaning is ambiguous then a court may consult other sources, including the statute's legislative history. *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012). When interpreting an ambiguous provision a court focuses on the "broader context and primary purpose of the statute." *Serv. Employees Int'l, Inc. v. Dir., Office of Workers Comp. Program*, 595 F.3d 447, 453 (2d Cir. 2010) (internal quotation and citation omitted). The Second Circuit has "long held" that where a statute is ambiguous, "it should be interpreted in a way that avoids absurd results." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 368 (2d Cir. 2006) (internal quotation omitted and citation omitted).

## A. The Text of the ADA is Ambiguous

The general rule of Title III states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182. The statute defines "public accommodation" as follows:

> The following entities are considered public accommodations for purposes of this subchapter if the entities affect commerce--
>
> A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
>
> (G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7).

Scribd argues that the meaning of "place of public accommodation" is clear and unambiguous, but the fact that reasonable jurists have reached different conclusions about how far Title III extends reveals some measure of ambiguity in the text of the statute. There are two main threads in the case law explored below. Briefly, some courts have reasoned that because all of the examples listed in Section 12181(7) are physical places, Title III only applies to discrimination occurring at a physical place or somewhere with a sufficient nexus to a physical place, while others have interpreted the statute more broadly.

On the narrow end, the Ninth, Third, and Sixth Circuits each considered ADA claims brought by an employee who received benefits through his or her employer that were issued by a third

party insurance company.  All three courts held that Title III did not apply because there was not a sufficient connection between the discrimination the plaintiffs alleged and a physical place.  *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) (explaining that "some connection between the good or service complained of and an actual physical place is required"); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613 (3d Cir. 1998) (holding "public accommodation" and the list of examples in the statute were not ambiguous and did not refer to non-physical access); *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1011 (6th Cir. 1997) (en banc) (noting that "a public accommodation is a physical place" and a benefit plan offered by an employer is not a good offered by a place of public accommodation).

In a related but somewhat more expansive vein the Eleventh Circuit held that Title III covers both tangible barriers (*e.g.*, physical barriers preventing a disabled person from entering an accommodation's facilities) and intangible barriers (*e.g.*, eligibility requirements or discriminatory policies) to a physical place.  *Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279, 1283 (11th Cir. 2002).  The Eleventh Circuit explained that *Weyer*, *Parker*, and *Ford* do not stand for the broad proposition that a place of public accommodation may exclude persons with disabilities as long as the discrimination

occurs offsite or over the telephone. *Id.* at 1284 n.8. At most those three cases can be read to require a "nexus" between the challenged service and the premises of the public accommodation. *Id.*

Several district courts bound to follow the precedent of the Ninth Circuit have concluded that Title III does not apply to various internet-based retailers or service providers. *See, e.g.*, *Jancik v. Redbox Automated Retail, LLC*, No. SACV 13-1387-DOC (RNBx), 2014 WL 1920751, at *8-9 (C.D. Cal. May 14, 2014) (holding a website was not a place of public accommodation because it was not a physical place and there was not a sufficient nexus between the website and physical kiosks); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1023-24 (N.D. Cal. 2012) (holding websites are not places of public accommodation because they are not physical places); *Oullette v. Viacom*, No. CV 10-133-M-DWM-JCL, 2011 WL 1882780, at *4-5 (D. Mont. Mar. 31, 2011) (holding a website by itself is not a physical place and the plaintiff did not allege a sufficient connection between the website and a physical structure); *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1114-16 (N.D. Cal. 2011) (explaining that a website is not a physical structure and plaintiff had not alleged a sufficient nexus to a physical place of public accommodation); *Earll v. eBay, Inc.*, No. 5:11-cv-00262-JF (HRL), 2011 WL 3955485, at *2 (N.D. Cal. Sept. 7, 2011)

(noting that places of public accommodation are limited to physical places); *see also National Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 954 (N.D. Cal. 2006) (holding plaintiffs had alleged sufficient facts to state a claim because the website was heavily integrated with brick-and-mortar stores and operated as a gateway to the stores); *Access Now, Inc. v. Southwest Airlines, Co.*, 227 F. Supp. 1312, 1319-21 (S.D. Fla. 2002) (rejecting the application of Title III to a website because it was not a physical location nor a means of accessing a concrete space).[1]

On the broad end, other circuit courts have read Title III to apply even in the absence of some connection to a physical place. In *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England*, 37 F.3d 12, 19 (1st Cir. 1994), the First Circuit explained that public accommodations are not limited to physical structures. The court reasoned that by including "travel service" on the list of examples in the definition, Congress clearly contemplated that "service establishments" could include providers of services that do not require a person

---

[1] It is important to note that although the Eleventh Circuit dismissed the appeal before it in *Access Now*, it did so only because the plaintiffs presented a new theory that the district court had no opportunity to consider. The plaintiffs argued for the first time on appeal that Southwest Airlines *as a whole* is a place of public accommodation because it operates a "travel service." *Access Now, Inc. v. Southwest Airlines, Co.*, 385 F.3d 1324, 1328-29 (11th Cir. 2004).

to physically enter a structure or site but may instead conduct their business by telephone or correspondence. *Id.* It would be "absurd" to conclude people who enter an office to purchase a service are protected by the ADA but people who purchase the same service over the telephone or by mail are not. *Id.*

Likewise, two Seventh Circuit cases confirm that court's view that the ADA applies to more than physical spaces. In *Doe v. Mutual Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) then Chief Judge Posner noted that facilities that exist in electronic space, including a website, are covered by Title III. He confirmed this position in *Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co. and Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001) by noting:

> The defendant asks us to interpret "public accommodation" literally, as denoting a physical site, such as a store or hotel but we have already rejected that interpretation. An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store.

Accordingly, the site of the sale is irrelevant. All that matters is whether the good or service is offered to the public. *Id.* The Northern District of Illinois recently followed suit and concluded that even though the American Bar Association does not offer its services at a physical site such a store it nevertheless could be a public accommodation for purposes of the

ADA.  *Straw v. Am. Bar Ass'n*, No. 14 C 5194, 2015 WL 602836, at
*6 (N.D. Ill. Feb. 11, 2015).

The Second Circuit has also reasoned that the statute was
meant to guarantee more than mere physical access to particular
types of businesses.  *Pallozzi v. Allstate Life Ins. Co.*, 198
F.3d 28, 32-33 (2d Cir. 1999).  In *Pallozzi*, the plaintiffs
alleged that an insurance company had discriminated against them
on the basis of their mental disabilities by refusing to issue
them a joint life insurance policy.  *Id.* at 29.  The court held
that an entity covered by Title III "is not only obligated by
the statute to provide disabled persons with physical access,
but is also prohibited from refusing to sell them its
merchandise by reason of discrimination against their
disability."  *Id.*  The *Pallozzi* court also noted that *Parker* and
*Ford* were not to the contrary.  Rather, their reasoning required
a nexus to a place of public accommodation but such a nexus was
obvious in *Pallozzi* because the insurance company operated an
insurance office, which is explicitly mentioned in the statute.
*Id.* at 32 n.3.  Neither *Parker* nor *Ford* held that Title III
ensures only physical access.  *Id.*

The *Pallozzi* court's reading of *Parker* and *Ford* is
consistent with the Seventh Circuit's reasoning.  In those two
cases, as well as *Weyer*, the Circuit Courts all considered the
same facts: an employer providing insurance benefits to its

employees through a third party rather than an insurance company offering policies directly to the public. This distinction is crucial. The fact that no goods or services were offered to the public means that the Third, Sixth, and Ninth Circuits did not consider facts that justified a finding that Title III requires some connection to a physical place. This minimizes the weight their reasoning should be given.

The Second Circuit has not yet considered a case in which a defendant operated no physical space open to the public but nevertheless provided goods or services to the public. However, *Pallozzi* arguably could be extended to a company's refusal to sell a disabled person its merchandise on the Internet and, by extension, imposing barriers that have essentially the same effect. Otherwise, a company could freely refuse to sell its goods or services to a disabled person as long as it did so online rather than within the confines of a physical office or store.

Along these same lines, the District of Massachusetts extended the reasoning of *Carparts* and held that Title III covers entities providing exclusively web-based services to the public. Judge Ponsor explained that the ADA covers not only transactions taking place over the phone or through correspondence but also "applies with equal force to services purchased over the Internet." *Nat'l Ass'n of the Deaf v.*

*Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012). The fact that the ADA does not include web-based services as a specific example of a public accommodation is irrelevant because such services did not exist when the ADA was passed and because Congress intended the ADA to adapt to changes in technology. *Id.* at 200-01. Notably, Congress did not intend to limit the ADA to the specific examples listed and the catchall categories must be construed liberally to effectuate congressional intent. *Id.* at 201. Judge Ponsor concluded that the plaintiffs, therefore, needed only to show that the website fell within one of the general categories enumerated in the statute, which it did.

While no circuit court has directly addressed whether a website with no physical retail outlet or building open to the public can be a place of public accommodation under Title III, clearly there is more than one reasonable interpretation of the language at issue here.[2] Therefore, the Court may go beyond the

---

[2] When Congress heard testimony on whether the ADA applies to private websites, several lawyers, professors, and other educated commentators reached different conclusions about how far Title III extends. *See generally Applicability of the Americans with Disabilities Act (ADA) to Private Internet Sites: Hearing before the H. Subcomm. on the Constitution of the House Comm. on the Judiciary*, 106th Cong., 2d Sess. 65-010 (2000). Clearly there is ambiguity in the statute sufficient for reasonable minds to debate.

text and context of the text to understand the statute's meaning.  *See Louis Vuitton*, 676 F.3d at 108.

### B. The Canons of Statutory Construction Do Not Resolve the Issue

Scribd argues that canons of statutory construction resolve any ambiguity in its favor for two reasons.  *See Frank G.*, 459 F.3d at 368 (explaining that if the terms of the statute are ambiguous a court should resort to the canons of statutory construction to resolve the ambiguity).  First, Scribd argues that if "place of public accommodation" is not construed as a physical space that is open to the public then Congress's use of the word "place" is improperly rendered superfluous.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").  Otherwise any business that offers goods or services to the public would be subject to the ADA and if that were the case Congress would not have bothered to delimit the categories Title III covers in such detail.

Second, Scribd argues that the canons of *noscitur a sociis* and *ejusdem generis* compel the Court to conclude that Congress did not intend to cover businesses unconnected to any physical space open to the public under Title III.  The former doctrine permits the meaning of doubtful terms and phrases to be determined by reference to other associated phrases.  The latter

suggests that where general words are accompanied by a specific enumeration of persons or things, the general words should be limited to the persons or things similar to those specifically enumerated. *City of New York v. Berretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008). Scribd argues that because all of the specific examples in the statute operate at concrete physical locations open to the public, the statute must be construed to apply only to such places.

The Court has several reactions to these arguments. First, the title of the relevant section is "public accommodation" and the categories in the definition are also described as "public accommodations." 42 U.S.C. § 12181(7). In those two instances the statute does not use the word place, which suggests that the accommodation must be available to the public but not necessarily at a physical place open to the public. Moreover, in other instances the statute uses the word "establishment" instead of "place." *See* 42 U.S.C. § 12181(7)(B) ("other establishment serving food or drink"); *id.* § 12181(7)(E) ("other sales or rental establishment"); *id* § 12181(7)(F) ("other service establishment"); *id.* § 12181(7)(K) ("other social service center establishment"). This suggests that Congress likely used the word "place" because there was no other less cumbersome way to describe businesses that offer those particular goods or services to the public. Moreover, the

instances in which the word "public" appears, it modifies the types of goods or services offered rather than "place." *See Id.* § 12181(7)(D) ("other place of public gathering," not public place of gathering); *id.* § 12181(7)(H) ("other place of public display or collection," not other public place of display or collection). Reading the statute to extend beyond physical places open to the public would not eliminate the need to demonstrate inclusion in one of the broad categories.

Next, as the court in *Carparts* noted, "travel service" is included as an example of a "service establishment." Even in 1990 it was entirely plausible that a travel service might operate no physical location open to the public but instead would conduct all business over the phone or by mail. Therefore "place" or "establishment" could, in context, refer to services provided offsite and, by logical extension, the Internet.

Finally, and perhaps most importantly, reading the statute as Scribd argues the Court should read it would lead to absurd results. Requiring a physical structure or some connection to a physical threshold would result in arbitrary treatment. For example, it would make little sense if a customer who bought insurance from someone selling policies door to door was not covered but someone buying the same policy in the parent company's office was covered. It is highly unlikely Congress intended such inconsistent results.

## C. The Statute's Legislative History Resolves the Ambiguity in the Plaintiffs' Favor

Finding that the canons of statutory construction do not conclusively resolve the ambiguity in the statute, the Court turns to external sources to better understand congressional intent. Congress enacted the ADA in 1990. The purpose of the ADA is clear: to end widespread discrimination against disabled individuals. When studying the need for such legislation, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(2). After a thorough investigation, Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals, and to integrate them "into the economic and social mainstream of American life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (internal quotation omitted).

As a remedial statute, "the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Mary Jo C. v. New York State and Local Retirement System*, 707 F.3d 144, 160 (2d Cir. 2013).

The twelve categories of public accommodations in particular also "should be construed liberally" to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled. *PGA Tour*, 532 U.S. at 676-77; H.R. Rep. 101-485(II), at 100 (1990) ("The Committee intends that the 'other similar' terminology should be construed liberally, consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities.").

This liberal approach is confirmed by the Committee Reports. It was "critical" to define places of public accommodation more broadly than the Civil Rights Act of 1964 because "discrimination against people with disabilities is not limited to specific categories of public accommodations." H.R. Rep. 101-485(II), at 35 (1990). It would make "no sense" for the law to say people with disabilities cannot be discriminated against if they want a sandwich at a deli but can be discriminated against next door at the pharmacy where they need to fill a prescription. *Id.* The goal is "full participation in and access to all aspects of society." *Id.* (quoting Statement of John Thornburgh, Att'y Gen. of the United States before the H. Subcomm. on Civil and Constitutional Rights, Ser. No. 58, October 11, 1989, at 192). Although the list of the twelve

categories in the statute is "exhaustive" it includes only "a representative sample of the types of entities covered under this category." H.R. Rep. 101-485(III), at 54 (1990). This suggests the Court should read the catchall categories broadly to give effect to congressional intent.

Scribd argues that only physical places open to the public can be public accommodations. However, the Committee Reports suggest that the important quality public accommodations share is that they offer goods or services to the public, not that they offer goods or services to the public at a physical location. A person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples in the definition. H.R. Rep. 101-485(III), at 54 (1990). Rather what matters is membership in one of the general categories. As an example, it is not necessary to show a jewelry store is like a clothing store but rather "it is sufficient that the jewelry store sells items to the public." *Id.* Here the Report does not say something like "it is sufficient that the store sells items at a place open to the public." *See also* S. Rep. 101-116, at 54 (1990) ("Similarly, although not expressly mentioned, bookstores, video stores, stationary stores, pet stores, computer stores, and other stores that *offer merchandise for sale or rent* are included as retail sales establishments." (emphasis added)).

The Reports suggest that the location of the discrimination is not as important in assessing the reach of Title III as the context in which it is occurring.

The Committee Reports also make it clear that Congress intended that the statute be responsive to changes in technology, at least with respect to available accommodations. H.R. Rep. 101-485(II), at 108 (1990) ("[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities . . . should keep pace with the rapidly changing technology of the times."). Specifically, the Report notes that an important area of concern is information exchange and although there were "still substantial barriers," that "great strides are being made." *Id.* Information exchange is exactly the service that Scribd provides. It seems likely that making websites compatible with screen reader software is the kind of advanced technology Congress was envisioning.

The Department of Justice ("DOJ") is responsible for enforcing Title III. Its regulations define "place of public accommodation" as "a facility operated by a private entity whose operations affect commerce and fall within at least one of the following categories." 28 C.F.R. § 36.104. The categories in the regulation are essentially the same as those in the statute. "Facility" is defined as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other

conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." *Id.* The plain language of the regulation does not require that an entity's facility be open to the public.

Importantly, in other contexts, the DOJ has taken the position that the ADA applies to the Internet and web-based goods and service providers. *See, e.g.*, Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996) ("Covered entities under the ADA are required to provide effective communication, regardless of whether they generally communicate through print media, audio media, or computerized media such as the Internet."); *Applicability of the Americans with Disabilities Act (ADA) to Private Internet Sites: Hearing before the House Subcommittee on the Constitution of the House Committee on the Judiciary*, 106th Cong., 2d Sess. 65-010 (2000) ("It is the opinion of the Department of Justice currently that the accessibility requirements of the Americans with Disabilities Act already apply to private Internet Web sites and services."); 75 Fed. Reg. 43460-01 (July 6, 2010) ("The Department believes that title III reaches the Web sites of entities that provide goods or services that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations."). The DOJ is currently in the process of

promulgating regulations that would codify the position it has taken in order to establish requirements for making websites accessible. *See* 75 Fed. Reg. 43460-01.

An agency interpretation contained in something akin to an opinion letter rather than a formal adjudication or notice-and-comment rulemaking is "entitled to respect" per *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) but only to the extent an interpretation has "the power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). The amount of deference an agency's opinion is owed depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Given the DOJ's body of experience, the Court will give some deference to its conclusion that the ADA applies to websites covered by one of the categories in the statute.

Scribd argues the Court should infer that Congress could have amended the ADA to more explicitly cover internet-only businesses but deliberately chose not to. Congress amended the ADA in 2008, after some of the narrower circuit court decisions discussed above were decided, but did not make any significant change to Title III. Therefore, Scribd contends, the Court should infer that Congress has assented to the narrow

interpretations of the Third, Sixth, and Ninth Circuits.  There
are many reasons why Congress may not have acted to amend the
ADA, including perhaps that it was not necessary in light of the
DOJ's interpretation of the statute.  The Court declines to give
any significant weight to congressional inaction in this
context.

The ADA was the most sweeping civil rights legislation
since the Civil Rights Act of 1964.  When it was enacted
Congress had no conception of how the Internet would change
global commerce.  As Representative Nadler put it, when the ADA
was enacted in 1990:

> [W]e were not communicating by e-mail, blog, or tweet; we
> were not filling virtual shopping carts with clothes,
> books, music, and food; we weren't banking, renewing our
> driver's licenses, paying taxes or registering for and
> taking classes online.  Congress could not have foreseen
> these advances in technology.  Despite Congress' great
> cognitive powers, it could not have foreseen these advances
> in technology which are now an integral part of our daily
> lives.  Yet Congress understood that the world around us
> would change and believed that the nondiscrimination
> mandate contained in the ADA should be broad and flexible
> enough to keep pace.

*Achieving the Promises of the Americans with Disabilities Act in*
*the Digital Age –– Current Issues, Challenges and Opportunities:*
*Hearing before the H. Subcomm. on the Constitution, Civil*
*Rights, and Civil Liberties of the House Comm. on the Judiciary*,
111th Cong., 2d Sess. 111-95 (2010).  Now that the Internet
plays such a critical role in the personal and professional

lives of Americans, excluding disabled persons from access to
covered entities that use it as their principal means of
reaching the public would defeat the purpose of this important
civil rights legislation.

Taking into account all of the relevant background
information explored above, the Court finds Judge Ponsor's
reasoning in *Netflix* persuasive.  The Internet is central to
every aspect of the "economic and social mainstream of American
life."  *PGA Tour*, 532 U.S. at 675.  In such a society,
"excluding businesses that sell services through the Internet
from the ADA would 'run afoul of the purposes of the ADA and
would severely frustrate Congress's intent that individuals with
disabilities fully enjoy the goods, services, privileges, and
advantages available indiscriminately to other members of the
general public."  *Netflix*, 869 F. Supp. 2d at 200 (quoting
*Carparts*, 37 F.3d at 20).

The Court must therefore determine whether the services
Scribd offers properly fall within any of the general categories
of public accommodations listed in the statute.  Construing the
list of categories liberally, Plaintiffs have persuasively
argued that Scribd's services fall within at least one of the
following categories: "place of exhibition or entertainment," a
"sales or rental establishment," a "service establishment," a
"library," a "gallery," or a "place of public display or

collection." Complaint ¶ 26 (citing 42 U.S.C. § 12181(7)). Therefore, the Court finds that Plaintiffs have sufficiently alleged that Scribd owns, leases, or operates a place of public accommodation. Accordingly, Scribd's motion to dismiss is **denied**.

Dated at Burlington, in the District of Vermont, this 19th day of March, 2015.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
